GEORGE GRUBBS ENTERPRISES, INC., a/k/a George Grubbs Nissan, Inc., David Kielson and Luke Maturelli, Appellants,

v.

Mitchel L. BIEN, Appellee.

No. 2–93–107–CV.

Court of Appeals of Texas, Fort Worth.

July 27, 1994.

Rehearing Denied Sept. 13, 1994.

David E. Keltner, Sharon N. Freytag, Karen S. Precella, LaDawn H. Conway, Haynes and Boone, L.L.P., Fort Worth, for appellants.

Michael W. Johnston, Robert J. Clinton, Richard E. McGary, Carol A. Swanda, Knox, Beadles & Johnston, Dallas, for appellee.

Before WEAVER, HICKS and FARRAR, JJ.

## OPINION

WEAVER, Justice.

Appellee, Mitchel Bien, sued appellants, George Grubbs Enterprises, Inc., a/k/a George Grubbs Nissan, Inc. (Grubbs), David Kielson, and Luke Maturelli, for various causes of action he alleges arose from mistreatment during sales negotiations at the Grubbs Nissan car dealership. Based on the

findings of the jury,[1] the trial court awarded judgment to Bien against all of the appellants, jointly and severally, in the amount of $573,815.00 for actual damages, exclusive of costs and postjudgment interest, and $222,294.49 for prejudgment interest. The judgment also awarded Bien $5,000,000.00 in exemplary damages against Grubbs.[2]

Appellants bring twenty-five points of error. They challenge the legal and factual sufficiency of the evidence and allege that the trial court committed various errors with respect to the jury charge and evidentiary rulings. Grubbs also challenges the award of exemplary damages. By a single cross-point, Bien alleges the trial court erred in failing to award him reasonable attorneys' fees as a prevailing party under the DTPA. We affirm.

## FACTUAL BACKGROUND

In the late 1970's, the Grubbs dealerships implemented a sales system technique known as the Automotive Profit Builder Controlled Track Selling System ("APB System"). Grubbs trained its sales force in the use of the APB System and expected its salespeople to follow this system. This system was still being used by Grubbs throughout the trial of this case.

Appellants' expert, Remar Sutton,[3] testified that the goal of a system sales technique, including the APB System, is "to excite the customer, confuse the customer, pressure the customer, and then take every last dime you can get regardless of the consequences to the customer." After Sutton was retained by appellants, he hired an undercover shopper, Daniel Buettner. Buettner's assignment was to shop various car dealerships in the Dallas–Fort Worth area, including Grubbs Nissan, and compare the techniques used at the deal-erships to what is known as the Bugelli incidents. Sutton testified that until recently Mr. Bugelli ran one of the largest dealerships in América. In Sutton's opinion, Bugelli runs the toughest track system operation in the country. In 1986 Sutton sent Buettner to work at a Bugelli dealership for three weeks. This was the first time in years that a track system had been documented. According to Sutton, the sales track system operated by Bugelli is the worst in the country.

Buettner did not know that Grubbs Nissan was the target of his comparison shopping survey. Of the dealerships Buettner surveyed in the Dallas–Fort Worth area, Grubbs Nissan was the most hard ball and deceptive in the use of the APB system. In fact, when Sutton asked Buettner to compare the Grubbs dealership to the Bugelli incidents, Buettner said "Grubbs made Bugelli look like a church."

On December 14, 1987, Mitchel Bien, a deaf mute, walked into the teeth of Grubbs Nissan's APB System. Bien was returning from his grandmother's where he had been doing some repairs around her house. It was cold and drizzly outside, with a little bit of rain. Bien lived with his mother and needed to be home for dinner between 6:00 and 6:30 p.m. As a rule, if Bien is going to be late he calls to let his mother know so she will not worry.

Bien was in the market for a new automobile. He was driving his deceased father's pickup and had been considering trading in the pickup for another vehicle. Grubbs Nissan was on the way home, so Bien decided to stop at the dealership. Since it was only 3:45 p.m., he felt he had plenty of time to stop at

1. The jury made findings favorable to Bien on negligence; gross negligence; intentional infliction of emotional distress; false imprisonment; fraud; and violations of the Deceptive Trade Practices—Consumer Protection Act (DTPA).

2. Bien also sued George Grubbs, Jr. and Louis Alvarez. However, the trial court granted summary judgment in favor of George Grubbs, Jr. and against Bien, and the jury absolved Alvarez of any wrongdoing. Thus, the judgment reflects a take-nothing judgment against Bien and in favor of Alvarez. This portion of the judgment, and the summary judgment in favor of George Grubbs, Jr. have not been appealed, and Alvarez and George Grubbs, Jr. are not parties to this appeal.

3. Sutton is a self-employed writer who writes primarily about the American automobile business. Prior to becoming a writer, Sutton had been a car salesman and part owner of an automobile dealership.

Grubbs Nissan and still make it home by 6:30 p.m.

While Bien was looking at some Nissan Pathfinders, Maturelli walked up to introduce himself. Upon discovering Bien was deaf, Maturelli went back inside and informed Kielson, his sales manager, that a deaf man was outside looking at cars. Maturelli told Kielson he had never dealt with a deaf person before. Kielson told him to put Bien through the APB System the same as any other person. After further discussions, Maturelli and Kielson came up with the idea of communicating by pen and paper.

After talking with Kielson, Maturelli went back outside and reintroduced himself via pen and paper. Maturelli then began using the APB System on Bien. He showed Bien the features on the Pathfinder and they took a test drive. After test driving the Pathfinder, Bien noticed a 300ZX and indicated he liked it. Maturelli and Bien then test drove a red 300ZX. After the test drive, pursuant to the APB System, Maturelli parked the car on the sold line even though it had not been sold.

Maturelli next took Bien on a tour of the dealership. Following the tour, Maturelli bought Bien a coke. This is also done pursuant to the APB System to detain the customer and obligate him to the salesperson. Under Grubbs' APB System, the salespeople were taught to put money in the coke machine before asking the customer what he is drinking. Thus, the customer cannot refuse the drink and becomes psychologically obligated to the salesperson. This is also done to make it difficult to leave since it is hard to drive with a drink in one's hands.

After Maturelli bought Bien a coke, they went into Maturelli's office where Maturelli began filling out a worksheet listing the various information about the 300ZX. This too is part of the APB System. It is done in an effort to impress the customer with the product, and in an attempt to obtain a bid on the vehicle from the customer.

After Maturelli filled out the worksheet and the price, he wrote the word "now" on a blank line for the delivery date. Bien responded that he did not want to buy the car at that time. Despite this, Maturelli wrote a note asking if Bien would be willing to do business that day if he could get an acceptable price. He then instructed Bien to put his initials beside this note and Bien complied. Maturelli next filled out a document on Bien's truck. He then went and pulled a computer price and equipment confirmation sheet on the 300ZX. It was at this point that the "negotiations" began.

Maturelli began by asking Bien what he would like to offer for the car. Bien offered to pay $18,500, less $4,775 trade-in for his truck. Maturelli asked Bien about a down payment and Bien said he could make a $4,000 down payment. Maturelli then feigned being Bien's friend and told Bien he needed some form of money to show his manager. Maturelli insisted that he needed Bien to write a $4,000 check so Maturelli could use it as leverage against his boss to get a good deal.[4] Contrary to his assertions, Maturelli knew his manager did not need to see a check to approve a deal. Rather, obtaining the check was simply another part of the APB System to prevent Bien from leaving and to exert psychological pressure on him.

Bien was hesitant to write the check, but Maturelli assured Bien he would return the check. However, according to the APB System under which Maturelli and the other Grubbs Nissan salespeople were trained, the check is only returned as an ultimate last resort because customers will not leave without it. In accordance with the system, Maturelli took the check to Kielson and instead of showing it to him and returning it to Bien, Maturelli left the check in Kielson's office.

During the discussions in Maturelli's office, they talked about Bien trading in his truck. Maturelli got Bien's keys to have the truck appraised. After it was appraised, pursuant

4. Maturelli wrote several notes in an effort to induce Bien to write the $4,000 check: "Give me some help! ... I need to show my boss some form of money to show him! ... My sharp buyers use a portion of their money to dangle in front of my boss to get good deal! ... Write me a check for 4,000 so I can bring it to my boss to try to get this deal.... I need a check for 4,000 to use as negotiating leverage to use against my boss I'll give it back."

to the APB System, the keys were not returned to Bien, but instead were placed in Kielson's office.[5] Thus, pursuant to Grubbs Nissan's APB System, Bien was now effectively trapped. They had his check which would only be returned as an ultimate last resort, and they also had his keys. They knew Bien was deaf and could not use the phone to call for help, and they knew he could not walk home because of the dangers presented by his disabilities, together with the darkness and bad weather. Grubbs had achieved its goal of obtaining a captive audience.

When Maturelli got Bien to write the $4,000 check, he promised to return it. However, Maturelli did not fulfill this promise. Maturelli admitted Bien had the right to have his check returned immediately upon request, and there is no question Bien had the right to go home immediately upon request. However, pursuant to the APB System, Maturelli ignored Bien's repeated pleas for the return of his check and that he be allowed to go home.[6] Despite these repeated requests, Maturelli continued in his attempt to obtain a sale, even mocking Bien at times. At one point in the so-called "negotiations" Bien explained that he would need to go home first and talk to his insurer. In response, despite the fact he knew Bien was deaf and could not use the phone, Maturelli told Bien that if he wanted to, he could call from the dealership. At another point in the negotiations, when Bien threatened to go to

the police if they did not return his check, Maturelli responded: "The police want you to buy a new car and get a good deal!" After writing this note, Maturelli leaned back in his chair and started laughing.

Maturelli never did fulfill his promise to return Bien's check. Instead, when Maturelli left his office at one point during the "negotiations," Bien got up without Maturelli's knowledge and went looking for his check. However, before leaving the office, Bien retrieved all the written notes so he could explain to his mother where he had been and why he was late getting home. Bien then walked through the halls of the dealership until he saw his check lying on Kielson's desk. He went into the office to get his check, and when he turned around to leave Maturelli was standing in the door. When Bien started to walk out, Maturelli moved to block his path. Bien then stuck the check in the front of his pants and Maturelli stepped aside.

After retrieving his check, Bien walked outside to get in his truck and leave. However, the truck was not where Bien had parked it. When Bien finally located his truck, the keys were not in it. Thus, he was forced to go back inside to get his keys before he could leave. When Bien went back inside, he met Maturelli in the hall. Maturelli was smiling at Bien and he was dangling the keys in front of him.

5. People at Grubbs who had been in the car business for years would sometimes joke about the fact that in the old days, car dealers would throw a customer's keys on the roof, and by doing so they would lose the keys so that the customer could not leave the dealership. This was done to obtain a captive audience to sell to and was known as "putting them on the roof." In order to obtain a similar result, the salespeople at Grubbs Nissan were instructed to put the customers' keys in the sales manager's office.

6. Some of Bien's notes to Maturelli include the following: "Please return my check *now....*" "Let me go home. I'm very hungry and if you mail me *good deal* then maybe I come over here to buy!" "Please return my check now!" "My brian [sic] still confuse so let me get home for need some rest someday I will come back." "I'm not good feel *now*." "Need some *rest*." "Where is my check now." "Where is my check?"

Maturelli eventually told Bien his check was "safe" and that it was in the desk office. However, Bien continued to request the return of his check and that he be allowed to go home: "Please listin [sic] me, please return my check back *now* because I'm little pressure myself. Please let me go home for rest." "Where is your boss's office and I have get my check back." "I'm not ready to buy because they make me a little crazy." "Tell your boss please return my check *now!*" "I will not buy today because I'm not very well." "Please bring it back *Now* or drive to Police dept." "Show me where is your boss's office." "If you won't show his office then go straight to police dept. or ..." "I'm already little crazy man because you both held me to *stay.*" "You can't hold me to stay here too long for 4 hours because I already been here for *4 hours.*" "Please gave [sic] me my check *Right now.*" "Please gave me my check back *NOW* or ..."

According to Bien's mother, Bien finally arrived home between 8:30 and 9:00 p.m. As Bien had suspected, his mother was very worried about him. Bien's mother testified that when he came in the house, he was very upset and he was making a crying and yelling noise. She also testified Bien had torn the check into small pieces and he threw the pieces into the air.

Bien claimed that prior to the Grubbs incident he never had any difficulty in dealing with the hearing world, but that afterwards he became depressed and withdrew into himself. He also claimed the incident caused him to have headaches, recurring nightmares and flash-backs, to lose his self confidence, to lose his trust for the hearing world and his ability to obtain and keep a job, and to lose his sexual desire. In general, he became moody, irritable and unhappy.

As a result of the Grubbs incident, Bien sought psychiatric counseling. He saw Dr. Stahlecker, Dr. Swen Helge, and Dr. Ursula Palmer. In addition, at appellants' request, Bien was examined by Dr. Russell Brown. All of these experts, including Dr. Brown, concluded that Bien suffered from severe anxiety disorder that was directly attributable to the Grubbs incident.

Not surprisingly, appellants' explanation of the events on December 14, 1987, is somewhat different than Bien's. Appellants admitted at trial that each and every action they took with Bien was done in conformity with the policies and procedures of Grubbs. Appellants simply argue that Bien was a very good negotiator who sent out all the signals of a typical buyer. In fact, despite Bien's repeated requests for his check and his threats to go to the police, appellants contend the series of "negotiations" between Bien and Maturelli were typical of any barter-based sales transaction, and argue that Bien misperceived the entire exchange.

Appellants also claim Bien did not suffer any damages as a result of the Grubbs incident. Instead, they contend Bien was in a precariously unstable emotional state prior to walking into the dealership. According to appellants, any emotional problems Bien suffers from were caused by other events, such as the death of his father, or the break-up with his girlfriend. Appellants also assert that Bien's unemployability is self-imposed and was not caused by the incident at Grubbs. However, after hearing three weeks of evidence, the jury rejected appellants' arguments. Likewise, Bien and his attorneys have requested this court to dismiss appellants' version of the events of December 14, 1987, as being "well imagined, well written fiction."

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ In point of error number eleven,[7] appellants allege the trial court erred in rendering judgment based on question number five, which addressed intentional infliction of emotional distress. Specifically, appellants contend there is no evidence to support submission of this question to the jury, and factually insufficient evidence to support the jury's answer to this question.

■ "In reviewing a no evidence point, we consider only the evidence and inferences tending to support the jury verdict and disregard all evidence to the contrary." *Juliette Fowler Homes v. Welch Associates*, 793 S.W.2d 660, 666 (Tex.1990). If there is any evidence of probative value to support submission of the intentional infliction of emotional distress issue and to support the jury's finding in response to the question, we must overrule appellants' no evidence argument. *See id.* "Evidence has probative force when

7. In cases where the judgment rests on multiple theories of recovery, if any one theory is valid an appellate court need not address the other causes of action. *City of San Antonio v. Rodriguez*, 856 S.W.2d 552, 555 (Tex.App.—San Antonio 1993, writ denied). *See also Kittyhawk Landing Apartments v. Anglin Construction*, 737 S.W.2d 90, 93 (Tex.App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.); *Buck v. Rogers*, 709 S.W.2d 283, 288 (Tex.App.—Corpus Christi 1986, no writ). Appellants' points of error one through ten concern their complaints with respect to the theories of recovery of negligence, gross negligence, fraud, and false imprisonment. Points twelve and thirteen deal with Bien's DTPA claims. Because the theory of intentional infliction of emotional distress is sufficient to support the judgment of the trial court, we will not address these points of error.

it is more than a mere surmise or suspicion and serves to prove the asserted proposition." *Briargrove Shopping Center v. Vilar,* 647 S.W.2d 329, 332 (Tex.App.—Houston [1st Dist.] 1982, no writ). However, if the evidence is so weak it does no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla, and is in legal effect, no evidence. *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex. 1983).

■ On the other hand, when reviewing a jury verdict to determine the factual sufficiency, we must consider *all* of the evidence in the record, including any evidence which is contrary to the verdict. *See Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). In making such a review, we must still respect the judgment of the jury. As this court has stated before:

> [W]e must avoid substituting our judgment for that of the jury and sustain [insufficient evidence] points only if we can state in what regard the evidence to the contrary outweighs that supporting the verdict, while clearly stating why the verdict is manifestly unjust, shocks the conscience or clearly demonstrates bias.

*Pipgras v. Hart,* 832 S.W.2d 360, 365 (Tex. App.—Fort Worth 1992, writ denied). *See also Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986) (appellate court should only set aside verdict due to insufficient evidence if it is so contrary to weight of evidence as to be clearly wrong and unjust).

■ To recover for intentional infliction of emotional distress, a claimant must establish the following elements: (1) the defendant(s) acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the actions of the defendant(s) caused the claimant's emotional distress; and (4) the emotional distress suffered by the claimant was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993). Appellants contend Bien failed to prove these elements.

■ Appellants first argue there is no evidence, or alternatively insufficient evidence, that they acted with intent or recklessness designed to cause Bien emotional harm. In support of this argument, appellants rely on

their own testimony that they did not intend to harm Bien, but instead only intended to sell him a car. However, the supreme court recognized in *Twyman* that "rarely will a defendant admit knowing of a substantial certainty that emotional harm would befall the victim." *Id.* at 623. The court went on to state that "[j]uries, however, are free to discredit the defendant's protestations that no harm was intended and to draw necessary inferences to establish intent." *Id.*

It is undisputed that the events of December 14, 1987 were part of a carefully predesigned and calculated scheme. In fact, appellants admitted that all of the actions taken with respect to Bien were done in conformity with Grubbs' policies and procedures. Additionally, George Grubbs, Jr. testified that after investigating the event involving Bien, he determined his employees had done nothing wrong and there was no need to alter the APB System used by Grubbs. All of the actions taken with respect to Bien were consistent with Grubbs' APB System, and the purpose of this system was to excite, confuse and pressure the customer in an effort to take every last dime possible from the customer regardless of the consequences.

Two former salesmen from Grubbs testified they had witnessed the APB System cause emotional distress, pressure and other physical manifestations on customers. They testified they had seen people actually cry as a result of the system, and some customers would yell, curse and jump out of their chair accusing the salesperson of attempting to cheat them out of their money. Others would become extremely irritated and attempt to "bolt," as the salespeople called it. This meant the customer was leaving; "they are getting the blankety-blank out of there." In fact, Grubbs' APB System anticipated such results and even had an established procedure to detain the customer further when the customer was "sweating bullets." If a customer continued to insist they were not going to buy a car that day, or if they became so upset they attempted to leave, then the salesman was to try and get a T.O., or takeover. This entails bringing in another salesperson, such as the desk manager, to take over the sales effort by appearing to be

the nice guy and attempting to continue with the sale. Remar Sutton described the T.O. system as the American version of Chinese water torture.

Appellants were aware the APB System was inflicting emotional pressure on Bien. Bien's requests for the return of his check and that he be allowed to go home became more urgent and frequent. He began underlining words and using capital letters and exclamation points, which one expert testified were the equivalent of a hearing person shouting. Bien told Maturelli that they were putting him through a lot of pressure, that they were making him crazy, that he was becoming sick and that he was confused and needed some rest. Maturelli did not think Bien was lying when Bien told him these things. Thus, since Grubbs' policy was that no customer could leave without the permission of management, Maturelli informed Kielson that Bien wanted his check back and that he wanted to go home. However, Kielson made the decision that the sale should go on, and pursuant to Kielson's instructions, Bien was subjected to a takeover by another salesman. Thus, in light of all the evidence discussed above, there is some evidence from which the jury could determine appellants acted intentionally or recklessly in their dealings with Bien.

■ Appellants next argue their conduct was not sufficiently extreme and outrageous to subject them to liability for intentional infliction of emotional distress. Instead, appellants maintain their conduct was "typical" of any barter-based business transaction between strangers.

■ Conduct is sufficiently extreme and outrageous "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman*, 855 S.W.2d at 621. Whether conduct satisfies this criteria is initially a question of law for the court. If the court determines that reasonable men may differ, then it is for the jury to decide whether the conduct is sufficiently extreme and outrageous to result in liability. *See Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993);

*Twyman*, 855 S.W.2d at 625 n. 21; RESTATEMENT (SECOND) OF TORTS § 46 cmt. h (1965).

In the present case, Maturelli induced Bien to write a $4,000 check by misrepresenting that this was necessary to obtain a "good deal" on a car. Once they had his check, appellants effectively detained Bien for close to four hours exerting constant pressure on him pursuant to the APB System in an effort to sell a car and obtain as much money as possible. Bien requested the return of his check at least twelve times, he requested that he be allowed to go home at least four times, and he threatened to go to the police at least twice. However, appellants ignored Bien's threats and his repeated and desperate pleas in order to continue with the sale. On appeal, appellants simply call Bien's actions "negotiating."

During these so-called "negotiations," Maturelli mocked Bien and his physical disability. When Bien stated he needed to talk with his insurer before purchasing a car, Maturelli told him to use the phone at Grubbs, knowing Bien could not do so because of his disability. When Bien threatened to go to the police, Maturelli responded that the police wanted Bien to buy a car from Grubbs and then leaned back in his chair and laughed at Bien. And when Bien finally was able to escape from the dealership with his check, he found that his keys were not in his truck and had to return inside only to find Maturelli dangling the keys and smiling at him.

In support of their argument that their conduct was not extreme and outrageous, appellants argue that the actual negotiating process took only twenty minutes. This argument is based on the speculative testimony of appellants' expert, Remar Sutton, that beginning with the computer price and confirmation sheet, the actual negotiations all probably took place in the last twenty minutes. However, the written exchanges between Bien and Maturelli indicate that Maturelli got Bien's $4,000 check at approximately 4:45 p.m., and that Maturelli was still pressuring Bien to buy the car at approximately 6:45 p.m. Other written notes show appellants were still pressuring Bien and refusing

to let him leave approximately four hours after he had arrived at the dealership. Thus, the jury could have reasonably dismissed Sutton's testimony that the actual negotiations lasted only twenty minutes, and could have determined that appellants detained Bien against his will for close to four hours in their efforts to sell him a car. Furthermore, even when Sutton testified that the actual negotiations lasted only twenty minutes, he still testified that he did not doubt Bien was traumatized by the experience. Based on all of this, as well as other evidence presented at trial, we conclude appellants' conduct was sufficiently extreme and outrageous to support submission of the question concerning intentional infliction of emotional distress to the jury, and to support the jury's answer to this question.

■ Finally, appellants contend there is no evidence or insufficient evidence to support the finding that their actions caused Bien's emotional distress, or to support the finding that Bien suffered severe emotional distress. Appellants continue to argue that any emotional problems Bien suffers from are a result of his pre-existing hypersensitivity and other influences in his life such as his father's death. Appellants also argue Bien does not suffer from severe emotional distress, but instead continues to enjoy a busy social life, including playing sports, dining out, and interacting with friends. However, in making these arguments appellants ignore the contrary evidence that the Grubbs incident caused Bien to suffer severe emotional distress.

Bien was evaluated by four doctors, including one who examined Bien at appellants' request. All four doctors concluded Bien suffered from psychological injuries directly attributable to the activities at the Grubbs dealership on December 14, 1987. As a result of the incident at Grubbs, Bien was diagnosed as having an atypical anxiety disorder, a generalized anxiety disorder, and an adjustment disorder with mixed emotional features. An individual suffering from these injuries would experience a subjective feeling of discomfort, dread, anxiety, and nervousness. The individual might also experience some physiological problems such as sweat-

ing, insomnia, increase in blood pressure, and increase in heart rate. According to Dr. Brown, the doctor who examined Bien at appellants' request, the incident at Grubbs was so traumatic that Bien was still unable to return to work some three years after the incident. Dr. Brown also determined that the incident had long-lasting effects on Bien's confidence and self-image in relation to the rest of the world. Thus, there is evidence from which the jury could reasonably determine that the incident at Grubbs caused Bien to suffer severe emotional distress.

Having reviewed all the evidence, we hold that there is sufficient evidence to support the jury's finding that appellants acted intentionally or recklessly, that their conduct was extreme and outrageous, and that their conduct caused Bien to suffer severe emotional distress. Accordingly, appellants' eleventh point of error is overruled.

## EXCLUSION OF TRC RECORDS

■ In point of error fourteen, appellants contend the trial court erred in excluding the testimony of the records custodian of the Texas Rehabilitation Commission (TRC). At trial, appellants offered into evidence certain business records of the TRC. During their case-in-chief, and later in rebuttal, appellants attempted to call the TRC records custodian to testify by a deposition on written questions to authenticate the records. However, appellants had failed to identify the records custodian as a person with knowledge of relevant facts in response to an interrogatory by Bien requesting appellants to designate potential witnesses. *See* Tex.R.Civ.P. 166b(2)(d), (e). As a result, the trial court excluded the records custodian's testimony pursuant to rule 215(5) of the Texas Rules of Civil Procedure. Because appellants could not otherwise authenticate the records, the trial court excluded them as well.

Appellants contend a records custodian is not the kind of witness who must be disclosed during discovery. Alternatively, they argue that even if the TRC records custodian should have been identified, they satisfied the good cause exception to rule 215(5). Bien asserts that a records custodian is a person with knowledge of relevant facts who

must be disclosed in response to a proper interrogatory, and that appellants did not establish good cause to allow introduction of the records custodian's testimony. However, we need not address these arguments.

"It is not reversible error to exclude evidence where substantially the same evidence was admitted during trial without objection." *American Oil Co. v. Fisher,* 659 S.W.2d 80, 83 (Tex.App.—Houston [14th Dist.] 1983, no writ). In the present case, evidence was admitted elsewhere which is substantially the same as the information contained in the TRC records.

Appellants sought to establish several things through the admission of the TRC records. For instance, appellants wanted to show that Bien suffered from depression before the incident at Grubbs, and that any harm Bien suffered was caused by factors other than the Grubbs visit, such as the loss of his father and the break-up with his girlfriend. They also wanted to rebut Bien's mother's testimony that the death of Bien's father did not affect Bien's self-confidence or ability to interact with hearing people. Appellants sought to contradict this with the TRC records which, according to appellants, reflect that Bien's father was the person Bien depended on for getting along in the hearing world. However, much of this evidence was presented to the jury through the testimony of various witnesses.

Dr. Swen Helge, a psychologist who treated Bien, testified that during counseling sessions Bien told him his father was the family member Bien was the closest to, and it was his father who had played with him, talked with him, and worked with him. Thus, the death of Bien's father was a substantial loss in his life, and was particularly stressful, upsetting and depressing for Bien. Although Bien's mother did testify at one point that the death of Bien's father did not affect his self-confidence or ability to interact with others, appellants acknowledge in their brief that at another point in her testimony she testified the death of his father still bothers Bien.

In addition to the loss of his father, Bien explained to Helge that the loss of his girlfriend was significantly stressful to him.

Bien also told Helge that he had suffered other depressing times in his life even before his father's death. Helge testified that Bien considered the incident at Grubbs and the death of his father to be equally emotionally devastating. On some occasions Bien would tell Helge that the death of his father was more emotionally devastating than the Grubbs incident, and on other occasions Bien would say that the Grubbs incident was more emotionally devastating than his father's death.

Dr. Ursula Palmer, a rehabilitation counselor for the deaf who had conducted a number of counseling sessions with Bien, testified that she certainly felt Bien was depressed and upset over the death of his father. Dr. Palmer also testified that Bien suffered a high degree of pressure as a result of the break-up with his girlfriend. In fact, Dr. Palmer testified that a graft chart prepared by Dr. Helge, depicting various events in Bien's life, revealed that the two events which caused Bien the highest degree of pressure were the incident involving the $4,000 check and the break-up with his girlfriend. According to the chart, the break-up with his girlfriend caused Bien more discomfort than the $4,000 check being held for ransom. The chart also indicated that the fact his brother never learned to sign bothered Bien to a degree roughly equivalent to being held by the salesman at Grubbs. Dr. Palmer testified that Bien had discussed these various events with her. Thus, according to the graft chart, the break-up with his girlfriend created more pressure on Bien than either the $4,000 check, or his being held by the salesman.

Appellants also sought to use the TRC records to establish that Bien's unemployability was not caused by the Grubbs incident, but was self-imposed because Bien was picky about the jobs he takes, and that Bien had trouble communicating with the hearing world even before the Grubbs incident. Dr. Helge testified that Bien had felt somewhat misunderstood from the time of his childhood, and that Bien had lived a life where he frequently felt lonely because he could not interact with others. According to Helge, Bien had related that throughout his life he

had always been more comfortable dealing with people who were hearing impaired or who could sign, and that he tended to restrict his social life even prior to the incident at Grubbs.

Shortly after the incident at Grubbs, Bien got a job as a Computer Assisted Draftsman (CAD) designer with General Dynamics (G.D.). However, Bien left this job after a couple of weeks. According to Bien, he left because he did not have confidence in himself following the Grubbs incident, and because the memory of that incident bothered him and caused him not to trust anyone. Bien also testified that because of the incident he was not comfortable writing and communicating. However, Bien admitted that he had not been trained as a CAD designer prior to taking the position at G.D., and that this job was a whole new field for him, at least as far as using a computer to do drafting work. Bien also admitted that the reason he gave his G.D. supervisor for leaving was because he was unhappy with the job assignment, and documentary evidence to this effect was admitted during trial. Bien claimed he gave his supervisor this reason because he was embarrassed to explain about the Grubbs incident.

Bien admitted at trial that he was unemployed for a period of two years prior to the incident at Grubbs. Additionally, there was evidence admitted at trial that Bien was very picky about his jobs. Bien was offered two jobs after the Grubbs incident, but turned them down because he wanted a job with regular hours, Monday through Friday, with no evening or weekend work, and with no layoffs.

Another purpose behind appellants' attempts to introduce the TRC records was to rebut Bien's testimony during appellants' case-in-chief that he had never considered suicide. However, during the presentation of Bien's case-in-chief, Bien himself testified that there were times, "once in a while," when he thought about taking his own life, but "not very often." Additionally, Dr. Helge testified that during one session Bien discussed certain suicidal plans. Bien told Helge he never anticipated committing suicide, but he did give some thoughts to it.

When Dr. Helge asked Bien how he would do it, Bien explained that his brother had a weapon. Dr. Helge testified that he did not recall Bien ever relating to him that he had contemplated taking his life even prior to the Grubbs incident or prior to his father's death. Dr. Helge said Bien may have shared "thoughts" about such things, but never actually contemplated it.

In their brief, appellants seem to argue that the TRC records indicate Bien had considered suicide before the Grubbs incident. However, this is not accurate. The TRC records indicate that on March 22, 1990, over two years after the Grubbs incident, Bien told a counselor that he had suicidal tendencies and he was presently considering suicide or had considered suicide several times in the past. The TRC records do not indicate whether these considerations occurred before or after the Grubbs incident.

A review of all the evidence reveals that essentially the same information contained in the TRC records was presented through the testimony of Dr. Helge, Dr. Palmer, and Bien himself. Because other evidence admitted throughout the trial conveyed substantially the same information to the jury as that contained in the TRC records, even if the trial court did err in excluding the records custodian's testimony, such error was harmless. *See Wilson v. John Frantz Co.,* 723 S.W.2d 189, 194 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.) (any error in excluding documents from evidence was harmless where other admitted evidence revealed the same facts evidenced by the documents); *American Oil Co.,* 659 S.W.2d at 83 (error, if any, in excluding original petition from evidence was harmless where petition was cumulative of deposition testimony admitted into evidence without objection); *First Continental Life & Accident Ins. v. Hanner,* 658 S.W.2d 798, 800 (Tex.App.—Beaumont 1983, no writ) (error in excluding exhibit from evidence was harmless where two witnesses gave same testimony presented in exhibit). Point of error fourteen is overruled.

## COMPENSATORY DAMAGES

In point of error fifteen appellants contend the trial court erred in entering judgment on

question thirteen, which addressed Bien's damages. Question thirteen awards Bien $573,815.00 in actual damages. The actual damages the jury awarded Bien are broken down into the following categories:

### MEDICAL/REHABILITATION

| | | |
|---|---|---|
| 1. | Past Medical | $ 70.00 |
| 2. | Future Medical | $ 6,000.00 |
| 3. | Past Rehabilitation | $ 3,205.00 |

### LOST EARNING CAPACITY

| | | |
|---|---|---|
| 4. | Past Lost Earning Capacity | $ 112,910.00 |
| 5. | Future Lost Earning Capacity | $ 34,650.00 |

### PHYSICAL SYMPTOMS

| | | |
|---|---|---|
| 6. | Past physical symptoms and discomfort | $ 50,000.00 |
| 7. | Future physical symptoms and discomfort | $ 50,000.00 |

### EMOTIONAL INJURY

| | | |
|---|---|---|
| 8. | Past Emotional injury and mental anguish | $ 101,980.00 |
| 9. | Future Emotional injury and mental anguish | $ 200,000.00 |

### LOSS OF SOCIETY

| | | |
|---|---|---|
| 10. | Past loss of society and reduced ability to socially interact with family, former fiancee and friends, and hearing people in general | $ 10,000.00 |
| 11. | Future loss of society and reduced ability to socially interact with family, former fiancee and friends, and hearing people in general | $ 5,000.00 |

---

Appellants allege there is no evidence to support submission of this question to the jury, and insufficient evidence to support the jury's answer to the question.

Although appellants have raised evidentiary challenges with respect to question thirteen, they do not challenge the actual dollar amounts awarded by the jury. Rather, appellants persist in arguing that their actions were not the cause of Bien's injuries, but that any injuries Bien suffers from are self-imposed or are the result of other earlier experiences in his life. In making this argument, appellants ignore the reality of the evidence.

■ Appellants first argue that the evidence does not support the jury's award of lost earning capacity because, according to appellants, any such damages were the result of Bien's own self-imposed unemployability. Although there was some evidence at trial that Bien was very picky about his jobs, and that he was unemployed for the two years prior to the Grubbs incident, there is also evidence that prior to the incident Bien had no problems dealing with the hearing world in an employment setting. In fact, one of Bien's former employers wrote him a very complimentary letter of recommendation. However, after the Grubbs incident Bien began to doubt his ability at work. He became nervous in employment settings, and he was not comfortable communicating through written notes in order to get instructions. Additionally, two of the doctors who examined Bien were of the opinion that his inability to work was due to the Grubbs incident and that this condition would continue into the near future. Thus, the evidence is both legally and factually sufficient to support the determination that Bien's lost earning capacity was caused by the incident at Grubbs.

■ Although appellants have not challenged the actual dollar amount awarded for lost earning capacity, we note that there is evidence which supports this dollar amount. Dr. Floyd Durham testified Bien had sustained a total loss of earning capacity of $856,345.00, and appellants' own expert, John Sartain, testified Bien suffered a loss of $130,165.00.

■ Appellants next argue the evidence is insufficient to support the jury's award of actual damages for past and future medical and rehabilitation expenses, for past and future physical symptoms and discomfort, and for past and future emotional injury and mental anguish. Again, appellants do not challenge the dollar amounts awarded, but instead argue these damages were caused by other factors in Bien's life and not appellants' conduct on December 14, 1987.

As a result of his experience at Grubbs, Bien was examined by four doctors, including one at appellants' request. All four concluded Bien suffered from a severe anxiety disorder that was directly attributable to the incident at Grubbs on December 14, 1987. Severe anxiety disorders threaten the quality of a person's life, and someone suffering from Bien's condition could expect to experience a subjective feeling of discomfort, dread, anxiety, and nervousness. Bien's condition also causes certain physiological problems, such as sweating, an increase in blood pressure, and an increase in heart rate.

Bien's mother observed the immediate effects of the Grubbs incident when Bien arrived home on December 14, 1987. Bien was very upset. He was crying, making a yelling noise, pacing back and forth, and red in the face. The effects of this incident did not end that night. Bien continued to suffer from the experience through the time of trial. He still experiences flashbacks of Maturelli leaning back in a chair laughing at him, dangling the keys at him, throwing the keys away so Bien would have to run after them, or playing hide and seek with his check. Bien also suffers from a loss of sexual drive, panic, headaches, irritability, thoughts of suicide, fear of open places, distrust of people, feelings of being trapped, hopelessness, and feelings of being taken advantage of. Before he felt equal to the hearing world, but now he does not. Instead he avoids the hearing world. Based on all the above, the evidence is legally and factually sufficient to support a finding that Bien's damages were caused by appellants' conduct.

As for the actual amount awarded by the jury, there is specific evidence which supports the amount awarded for past and future medical and rehabilitation expenses. There was evidence presented at trial that Bien had incurred expenses for past rehabilitation in the sum of $3,205.00, and there was evidence that Bien could expect to incur future medical and rehabilitation expenses of $6,000.00. Appellants have failed to direct us to any evidence contradicting these figures.

Bien's damages for physical symptoms and discomfort and mental anguish are the type of damages which are incapable of measurement with precision. As such, their determination is left primarily to the discretion of the jury. *Country Roads, Inc. v. Witt,* 737 S.W.2d 362, 365 (Tex.App.—Houston [14th Dist.] 1987, no writ). Appellate courts will not disturb a jury's award of such damages as being excessive unless there is "a clear showing of passion, bias, or prejudice and a finding that the award is so excessive as to shock the conscience of the court." *Id.* Each case must be reviewed based on its own facts and circumstances. Comparisons with other cases or verdicts is of little help because the same loss will result in different damages to different individuals. *Caterpillar Tractor Co. v. Boyett,* 674 S.W.2d 782, 790 (Tex.App.—Corpus Christi 1984, no writ). Applying these standards to all the evidence in the present case, we hold that the evidence is both legally and factually sufficient to support the jury's award of damages for Bien's physical and emotional injuries.

Appellants also challenge the award of damages for loss of society in question thirteen. Appellants argue that the evidence at trial showed that Bien enjoys a very busy social life and is able to interact with family and friends on a daily basis. Appellants also argue, as they argued throughout trial and have continued to argue throughout this appeal, that to the extent Bien has suffered a loss of society, it is the result of his previous experiences and not appellants' conduct. However, the jury rejected appellants' arguments at trial and we do likewise.

Although there is some evidence Bien still participates in sports and is able to eat out with friends and do his own grocery shopping, there is other evidence which supports the award for loss of society. Persons close to Bien testified that he became withdrawn, depressed, and different after the Grubbs incident. At the time of the incident Bien was engaged to be married. However, after the incident the wedding was called off. Bien no longer has any girlfriends and he no longer wants any. The incident also caused Bien to distrust the hearing world and this proved to be an impediment to his interaction with mainstream society. Thus, there is both legally and factually sufficient evidence

to support the award of damages for loss of society. The evidence is also legally and factually sufficient to support the jury's award of damages for the other categories of actual damages. Point of error fifteen is overruled.

## EXEMPLARY DAMAGES

■ In points of error sixteen through twenty-four, Grubbs raises various arguments challenging the trial court's award of exemplary damages. In point sixteen, Grubbs attacks the trial court's instruction on "single business enterprise" in question fifteen. The instruction in question fifteen which Grubbs complains about reads as follows:

> You are instructed that in determining the amount of exemplary damages you may not consider the assets, wealth or profitability of the dealerships operating under Grubbs Auto Park, Inc., unless you find that Grubbs Auto Park, Inc., and George Grubbs Enterprises, Inc., are operated as and constitute a single business enterprise. A "single business enterprise" exists when two or more corporations associate together and, rather than operate as separate entities, integrate their resources to achieve a common business purpose.

Appellants objected in writing to question fifteen on the basis that this instruction was incomplete in that it did not give the jury any guidance as to what factors to consider in determining whether two or more entities are operated as a single business enterprise. The trial court overruled this objection.

■ On appeal, Grubbs contends the trial court erred in failing to instruct the jury on the relevant factors to consider in determining whether Grubbs Enterprises, Inc. and Grubbs Auto Park, Inc. constituted a "single business enterprise." However, the majority of cases Grubbs relies on deal with the issue of "alter ego" and what factors must be included in an "alter ego" instruction. Such cases do not support Grubbs's argument concerning the instruction on "single business enterprise" because the doctrine of "alter ego" is a separate and distinct theory. *Hideca Petroleum Corp. v. Tampimex Oil Inter-*

*national Ltd.,* 740 S.W.2d 838, 843 (Tex. App.—Houston [1st Dist.] 1987, no writ).

The only case Grubbs relies on which is relevant to our review of the instruction on "single business enterprise" is *Paramount Petroleum Corp. v. Taylor Rental Center,* 712 S.W.2d 534 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.). In *Paramount Petroleum,* the court discussed the theory of "single business enterprise" and noted that "when corporations are not operated as separate entities but rather *integrate their resources to achieve a common business purpose,* each constituent corporation may be held liable for debts incurred in pursuit of that business purpose." *Id.* at 536 (emphasis added). Although the court did list several factors which it considered in determining whether the corporations had operated as a "single business enterprise," *Paramount Petroleum* did not involve the question of what is necessary for a proper jury instruction on this issue. *See id.*

Grubbs has not cited any cases, and we are aware of none, which hold that an instruction on "single business enterprise" is defective if it does not include factors which should be considered in making the determination of whether two or more corporations are operating as a single business enterprise. While we believe it would have been helpful to the jury for the trial court to list such factors, the instruction given is a correct statement of law and we do not believe the failure to include a list of factors constitutes reversible error. Point of error sixteen is overruled.

In point of error seventeen, Grubbs contends the trial court erred in awarding Bien exemplary damages because, according to Grubbs and the other appellants, Bien is not entitled to receive actual damages under any of the jury's findings. However, under point of error eleven we held the evidence was sufficient to support the jury's finding of intentional infliction of emotional distress, and under point of error fifteen we held the evidence was sufficient to support the jury's award of actual damages. Point of error seventeen is overruled.

■ In point of error eighteen, Grubbs alleges the trial court erred in awarding Bien exemplary damages because, according to

Grubbs, Bien did not obtain a finding that he suffered harm that resulted from malice, fraud, gross negligence, or a tort committed with intent to harm. With respect to this argument, Grubbs contends the jury finding on intentional infliction of emotional distress cannot support the award of exemplary damages because the standard submitted to the jury included recklessness. However, even though the question on infliction of emotional distress included a reckless standard, the undisputed evidence established that every action taken by Grubbs and its employees was done intentionally, knowingly, and as part of a calculated scheme. None of the acts committed against Bien were done unintentionally.

■ Furthermore, although a finding of intent to harm will support an award of exemplary damages, it is not *necessary*. *See Trenholm v. Ratcliff,* 646 S.W.2d 927, 933 (Tex.1983). "Conscious indifference to the rights of others is also sufficient for an award of exemplary damages." *Id.* In *Twyman,* the supreme court noted that reckless infliction of emotional distress includes conduct where a defendant deliberately acts, or fails to act, in conscious disregard of the risk of harm to others. *Twyman,* 855 S.W.2d at 624. Thus, the jury's finding that appellants intentionally or recklessly inflicted emotional distress on Bien is sufficient to support an award of exemplary damages. Point of error eighteen is overruled.

In point of error nineteen, Grubbs contends the trial court erred in refusing to submit their requested issue on ratification or authorization as a predicate to finding Grubbs liable for exemplary damages on the basis of the conduct of an employee. Specifically, Grubbs argues that the finding of fraud on the part of Maturelli cannot support the award of exemplary damages without a find-

ing of "ratification" on the part of Grubbs. However, we have previously pointed out that we do not need to address the theory of fraud because the jury's finding on intentional infliction of emotional distress is sufficient to support the trial court's judgment.[8] Thus, we need not address point nineteen.

■ In point of error twenty, Grubbs makes the alternative argument that the trial court erred in awarding exemplary damages in excess of four times the amount of actual damages. In support of this argument, Grubbs relies on section 41.007 of the Texas Civil Practice and Remedies Code, which limits the award of exemplary damages to four times the amount of actual damages or $200,-000, whichever is greater. TEX.CIV.PRAC. & REM.CODE ANN. § 41.007 (Vernon Supp.1994). However, section 41.007 does not apply to exemplary damages resulting from an intentional tort. *Id.* § 41.008. Thus, the limits do not apply to intentional infliction of emotional distress. Point of error twenty is overruled.

■ In point of error twenty-one, Grubbs contends the award of exemplary damages violates the United States and Texas Constitutions. Specifically, Grubbs argues the trial court's charge on exemplary damages failed to properly limit the jury's discretion because question fifteen instructed the jury that it could consider "the wealth of the defendant" in determining the amount of exemplary damages to award.[9] Grubbs also complains that the trial court's instruction on single business enterprise in question fifteen impermissibly allowed the jury to consider Grubbs' "assets, wealth or profitability."[10]

In support of its position, Grubbs relies on *TXO Production Corp. v. Alliance Resources Corp.,* —— U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). According to Grubbs, the Supreme Court expressed doubt in *TXO*

---

8. *See supra* footnote 7.

9. In addition to the wealth of the defendant, question fifteen instructed the jury that it could consider other factors such as the nature of the wrong, the frequency of the wrong committed, the degree of culpability of the wrongdoer, the situation and sensibilities of the parties concerned, the extent to which such conduct offends a public sense of justice and propriety, and the size of an award needed to deter similar wrongs

by the defendant and others similarly situated in the future.

10. In their objections to question fifteen at trial, appellants stated that "the wealth of the defendant is not an appropriate factor, but rather the assets of the defendant can be considered." Thus, Grubbs waived any complaint it may have with regard to the jury's consideration of its assets.

that an "emphasis on wealth" comports with due process. However, we do not view *TXO* as broadly as Grubbs. In addition to an instruction that the jury could take into account "the wealth of the perpetrator," the trial court in *TXO* went on to instruct the jury that "the law recognizes that to in fact deter such conduct may require a larger fine upon one of large means than it would upon one of ordinary means under the same or similar circumstances." *Id.* at —— n. 29, 113 S.Ct. at 2723 n. 29. The Court agreed with the defendant that this emphasis on the wealth of the wrongdoer increased the risk that the award may have been influenced by prejudice against large corporations. *Id.* at ——, 113 S.Ct. at 2723. However, the Court went on to note that in *Pacific Mutual Life Ins. Co. v. Haslip*, 499 U.S. 1, 21–22, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 22 (1991), it had referred to the "financial position" of the defendant as one factor that could be considered in assessing punitive damages. *TXO*, —— U.S. at ——, 113 S.Ct. at 2723. The Court did not further address this issue in *TXO* because the defendant had not properly presented its constitutional attack on the jury instructions to the state court below. *Id.* at ——, 113 S.Ct. at 2723–24.

Unlike *TXO*, the trial court in the present case did not include an additional instruction which placed a so-called "emphasis" on wealth in the determination of exemplary damages. Rather, the trial court simply included the wealth of the defendant as one of several factors the jury could consider in determining the amount of such an award. Based on this distinction, and based on the Supreme Court's holding in *Haslip* which approved consideration of the "financial position" of a defendant in awarding exemplary damages, we do not believe *TXO* supports appellants' position that the trial court erred in instructing the jury that it could consider "the wealth of the defendant."

Grubbs also relies on *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (1994), in support of its position that the trial court should not have instructed the jury to consider "the wealth of the defendant." However, such reliance is misplaced in the present case. In *Moriel*, the Texas Supreme Court noted that many aspects of the procedures previously employed by Texas courts in exemplary damage cases do not compare favorably to those examined by the United States Supreme Court in *Haslip* and *TXO*. *Id.* 879 S.W.2d at 28–29. Thus, *Moriel* focuses on "procedural safeguards" which should be followed in cases involving exemplary damages, such as bifurcation of the determination of the amount of exemplary damages from the remaining issues. It does not change the law with respect to what factors a jury should consider in determining the amount of exemplary damages to award. *See id.* at 26–33.

Grubbs argues that even if the financial status of a defendant is an appropriate factor for consideration, the jury should be limited to considering the "net worth" of the defendant, and not the "wealth" of the defendant or the "assets, wealth or profitability" of the defendant. Grubbs bases this argument on the supreme court's use of the term "net worth" in *Moriel*, 879 S.W.2d at 29–30, and in *Lunsford v. Morris*, 746 S.W.2d 471, 473 (Tex.1988). According to Grubbs, a defendant's "net worth" consists only of the amount its assets exceed its liabilities, and allowing consideration of a defendant's "wealth" greatly exceeds the acceptable consideration of "net worth." However, we do not believe a jury's consideration of a defendant's financial status should be as limited as Grubbs would have us hold.

After noting that a trial court should bifurcate the determination of the amount of punitive damages from the other issues at trial, the court in *Moriel* stated that:

> If the jury answers the punitive damage liability question in the plaintiff's favor, the same jury is then presented evidence relevant only to the amount of punitive damages, and determines the proper amount of punitive damages, considering the totality of the evidence presented at both phases of the trial.

*Moriel*, 879 S.W.2d at 30. Thus, the supreme court did not limit the jury's consideration to "net worth." The court left it open for the jury to consider any evidence relevant to the amount of exemplary damages to be awarded. Additionally, even the United States Supreme Court has interpreted the

Texas Supreme Court's holding in *Lunsford* as permitting a jury to consider the "wealth" of the defendant. *See TXO*, —— U.S. at —— n. 31, 113 S.Ct. at 2723 n. 31.

As Justice Gonzalez pointed out in his concurring opinion in *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322 (Tex.1993), in assessing punitive damages, "the jury must have enough information to assess the true means of the defendant." *Id.* at 330 (Gonzalez, J., concurring). According to Justice Gonzalez, a rule which limits the jury's consideration only to assets minus liabilities would impede the goal of determining the true "wealth" of a defendant. *Id.* at 331. We agree.

In *Lunsford*, the supreme court stated that "[a] defendant's 'ability to pay' bears directly on the question of adequate punishment and deterrence. That which could be an enormous penalty to one may be but a mere annoyance to another." *Lunsford*, 746 S.W.2d at 472. Because the determination of Grubbs' ability to pay necessarily involves more than consideration of its "net worth" as defined by Grubbs, the trial court did not err in instructing the jury that it could consider "the wealth of the defendant" in determining the amount of exemplary damages. Nor did the court err in instructing the jury it could consider the "profitability" of Grubbs.[11] Point of error twenty-one is overruled.

■ In point of error twenty-two Grubbs argues that the trial court erred in awarding Bien exemplary damages because, according to Grubbs, there is no evidence to support the submission of question fifteen on exemplary damages to the jury, and because the evidence is factually insufficient to support the jury's answer to the question. Like the other evidentiary challenges by Grubbs and the other appellants, this point of error is without merit.

■ An appellate court cannot vacate a damage award or suggest a remittitur unless the evidence supporting the award is so factually insufficient, or the amount of the award is so against the great weight and

preponderance of the evidence, as to be manifestly unjust. *Moriel*, 879 S.W.2d at 30–31. In *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex.1986) (opinion on reh'g), the supreme court held that when reversing on insufficiency grounds, courts of appeals should detail the evidence in their opinions and discuss why the jury's finding is factually insufficient or so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Id.* at 635. Likewise, due to the broad discretion given to Texas juries in imposing punitive damages, the supreme court determined in *Moriel* that as part of the procedural safeguards to be followed in cases involving exemplary damages, Texas appellate courts should apply a similar standard of review when *affirming* exemplary damage awards over a challenge that it is based on insufficient evidence or is against the great weight and preponderance of the evidence. *Moriel*, 879 S.W.2d at 30–31.

We have previously discussed the evidence which supports the jury's findings on intentional infliction of emotional distress and actual damages. Additionally, we note that the conduct involved in the present case was intentional and part of a carefully calculated scheme. This scheme was designed to take advantage of Bien and other customers through the use of deception and psychological pressure in an effort to make as much profit as possible without regard to the consequences to the customer. As part of such a scheme, the conduct was carried out not just against Bien, but on a systematic and daily basis. Furthermore, Grubbs initiated an investigation after the incident involving Bien and was of the opinion there was no wrongdoing with respect to Bien's treatment at the dealership. In fact, during trial Grubbs indicated it had no intention of changing its system and that even at the time of trial any person who went to the dealership could expect to be handled through the APB System which was applied to Bien. Having considered all of the evidence in the present case, we find it is both

---

11. Although Justice Gonzalez is of the opinion that a corporate defendant's assets are irrelevant in determining its wealth until its liabilities are subtracted, *see Wal–Mart Stores, Inc. v. Alexan-* der, 868 S.W.2d 322, 331 (Tex.1993) (Gonzalez, J., concurring), Grubbs waived any complaint it may have had with respect to the consideration of its assets. *See supra* note 10.

legally and factually sufficient to support the award of exemplary damages. Point of error twenty-two is overruled.

■■■ In point of error twenty-three, appellants allege the trial court erred in awarding exemplary damages to Bien because the award does not reasonably relate to the actual damages. We disagree. "An award of exemplary damages rests largely in the discretion of the jury and will not be set aside as excessive unless the amount is so large as to indicate that it is the result of passion, prejudice, or corruption, or that the evidence has been disregarded." *Ethicon, Inc. v. Martinez*, 835 S.W.2d 826, 835 (Tex. App.—Austin 1992, writ denied). When reviewing an award of exemplary damages we must consider: (1) the nature of the wrong; (2) the character of the conduct involved; (3) the degree of culpability of the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the extent to which such conduct offends a public sense of justice and propriety. *Alamo National Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). Although exemplary damages must be reasonably proportioned to the amount of actual damages, there is no set rule or ratio between the amount of actual and exemplary damages which is considered reasonable. *Martinez*, 835 S.W.2d at 835. This determination depends on the facts of each particular case. *Kraus*, 616 S.W.2d at 910.

In addition to considering the specific facts and circumstances of the present case as set out above, we note that ratios of exemplary to actual damages considerably higher than the approximately nine to one ratio present in this case have been upheld in previous cases. *See Greenhalgh v. Service Lloyds Ins. Co.*, 787 S.W.2d 938, 939 (Tex.1990) (sixteen to one ratio); *International Armament Corp. v. King*, 686 S.W.2d 595, 596 (Tex.1985) (twenty-five to one ratio); *Beacon National Ins. Co. v. Reynolds*, 799 S.W.2d 390, 398 (Tex.App.—Fort Worth 1990, writ denied) (twenty-seven to one ratio); *Carr v. Galvan*, 650 S.W.2d 864, 869 (Tex.App.—San Antonio 1983, writ ref'd n.r.e.) (fourteen to one ratio). Having considered the facts of the present case in light of the factors discussed in *Kraus*, we cannot find that the jury's award

was the result of passion, prejudice, or that the jury disregarded the evidence. We also do not find that the amount of exemplary damages awarded does not reasonably relate to the actual damages awarded. Point of error twenty-three is overruled.

■■ In point of error twenty-four, appellants argue the award of five million dollars in exemplary damages is grossly excessive and results from passion and prejudice, and that this court should order a remittitur. This we decline to do. Appellants' characterization of the exemplary damages award as being the result of passion or prejudice is not supported by the record. The jury specifically exculpated Louis Alvarez of any wrongdoing, and the jury also failed to make affirmative findings on all of Bien's issues. Additionally, the actual damages awarded by the jury were less than that requested by Bien, and the jury awarded exemplary damages only against Grubbs. Having considered these findings, which indicate conscious deliberation on the part of the jury, together with the facts of this case as discussed under points twenty-two and twenty-three, we do not believe the award of exemplary damages is excessive so that a remittitur is required. Point of error twenty-four is overruled.

## PREJUDGMENT INTEREST

In point of error twenty-five, appellants allege the trial court erred in awarding prejudgment interest on the jury's award of future damages. This issue was recently addressed by the Texas Supreme Court in *C & H Nationwide, Inc. v. Thompson*, 37 Tex. Sup.Ct.J. 1059, 1994 WL 278167 (June 22, 1994), where a majority of the court held that prejudgment interest is recoverable on future damages. *Id.* at 1060. Accordingly, point twenty-five is overruled.

## BIEN'S CROSS–POINT

The jury made findings favorable to Bien on both his common law tort claim for intentional infliction of emotional distress and on his DTPA claim. The jury also determined that $293,196.49 was a reasonable and necessary attorneys' fee, as measured in dollars and cents, and alternatively, that 40% was a reasonable and necessary attorneys' fee stat-

ed as a percentage of Bien's recovery. Based on the jury's findings the trial court awarded Bien $573,815.00 for compensatory damages and $5,000,000.00 for exemplary damages. The court also awarded Bien prejudgment interest of $222,294.49, for a total judgment of $5,796,109.49. However, no attorneys' fees were awarded in the judgment. In his cross-point, Bien alleges the trial court erred in failing to award him attorneys' fees under the DTPA.

Under Bien's common law claim, exemplary damages were recoverable but attorneys' fees were not. Conversely, attorneys' fees are recoverable under the DTPA, but damages are limited to three times the amount of actual damages. *See* TEX.BUS. & COM.CODE ANN. § 17.50(b)(1) (Vernon Supp.1994). A quick calculation reveals that under the common law action Bien was entitled to recover the $5,796,109.49 awarded to him in the judgment, while the maximum recovery he could have received under the DTPA action was $2,867,408.33, consisting of trebled actual damages in the amount of $1,720,445.00, and attorneys' fees, based on the 40% contingency, in the amount of $1,146,963.33.[12]

■ Under rule 301 of the Texas Rules of Civil Procedure, the judgment of the trial court must be so framed as to give the party all the relief to which he may be entitled. "When a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Southwestern Bell Telephone Co.*, 747 S.W.2d 785, 787 (Tex.1988). The court may not render judgment upon both grounds of recovery because this would grant an impermissible double recovery. *Southern County Mutual Ins. Co. v. First Bank and Trust of Groves*, 750 S.W.2d 170, 173–74 (Tex.1988). Additionally, the DTPA expressly provides that "no recovery shall be permitted under both [the DTPA] and another law of both actual

damages and penalties for the same act or practice." TEX.BUS. & COM.CODE ANN. § 17.43 (Vernon 1987). A party can recover both actual and. treble damages under the DTPA *and* actual and exemplary damages under a common law theory of recovery only if he or she obtains separate and distinct findings of actual damages on both the deceptive acts or practices and the common law theory of recovery. *Birchfield v. Texarkana Memorial Hospital*, 747 S.W.2d 361, 367 (Tex.1987).

■ In the present case there are no separate and distinct findings of actual damages with respect to the alternative theories of recovery. The same acts or conduct which support the jury's affirmative findings under the DTPA also support its affirmative finding of intentional infliction of emotional distress. Thus, Bien cannot recover actual damages under the DTPA *and* under his common law theory of recovery. He can only recover actual damages based on one theory or the other. Because a party cannot recover exemplary damages in the absence of a recovery of actual damages, Bien's recovery of actual damages in the present case is necessarily based on his common law theory of recovery in order to support the award of common law exemplary damages. *See Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986).

■ Because Bien could not recover both statutory treble damages and common law exemplary damages, he was confronted with a situation requiring an election of alternative measures of damages. *Birchfield*, 747 S.W.2d at 367. The record does not reflect that Bien made such an election. However, when a prevailing party fails to elect between alternative measures of damages, the trial court should utilize the findings affording the greater recovery and render judgment accordingly. *Id.* In determining which cause of action or measure of damages affords the greatest relief, the trial court may consider attorneys' fees. *Town East Ford Sales, Inc.*

**12.** In making this comparative calculation, we have used the method for calculating attorneys' fees as suggested by Bien, whereby the trebled actual damages amount to 60% of Bien's total recovery, with the remaining 40% being Bien's attorneys' fees. We express no opinion as to whether this method suggested by Bien is the correct method for calculating attorneys' fees under the DTPA. Rather, we use this method solely for the purpose of maximizing the amount of attorneys' fees for comparative purposes under Bien's cross-point.

*v. Gray,* 730 S.W.2d 796, 812 (Tex.App.—Dallas 1987, no writ).

It is obvious from the above comparisons that recovery under his common law action afforded Bien the greater relief, and the actions of the trial court show that it made a determination to that effect and entered judgment for Bien accordingly. The trial court initially signed a judgment which awarded Bien $2,318,443.79 in attorneys' fees. However, after considering appellants' Motion for New Trial and Alternative Motion for Remittitur, the court entered the final judgment in this case, which is substantially the same as the initial judgment, but which eliminates any award of attorneys' fees. In doing so the trial court stated:

> [B]ecause attorney's fees are not recoverable under a common law tort action and because the plaintiff's tort recovery exceeds his statutory recovery under the Deceptive Trade Practices Act and because attorney's fees for a statutory recovery cannot be cumulated on to a common law recovery, it is therefore ORDERED that the judgment be MODIFIED to reduce it by $2,318,443.79, being the amount recoverable as attorney's fees under the Jury's findings on the statutory cause of action. . . .

Bien does not dispute that the trial court granted him the greater relief in awarding him judgment under his common law theory of recovery. Rather, he argues under this point that the trial court erred in not also awarding him attorneys' fees under his DTPA claim, calculated at 40% of the common law award, and then in not accumulating or adding such attorneys' fees to the total amount otherwise awarded to him under his common law claim. He is asking us to modify the judgment so as to award him attorneys' fees in the amount of $3,715,876.67, for a total judgment of $9,289,691.67. Although the judgment in effect awarded him common law exemplary damages, in lieu of and far in excess of any trebled damages he might have recovered under the DTPA, he nevertheless maintains that he is entitled to retain those benefits and at the same time recover attorneys' fees under the Act.

■ Bien contends he is entitled to attorneys' fees, notwithstanding his common law recovery, because he was a "prevailing party" under the DTPA, having received an affirmative jury finding that appellants violated the Act. Bien claims that in such a case, the award of attorneys' fees under the DTPA are mandatory. According to Bien, whether the judgment awards him damages under the DTPA is immaterial. Bien relies on the cases of *McKinley v. Drozd,* 685 S.W.2d 7 (Tex.1985), and *Matthews v. Candlewood Builders, Inc.,* 685 S.W.2d 649 (Tex. 1985), in support of his position. However, those cases are distinguishable from the present case. *McKinley* and *Matthews* are both "zero net recovery" cases where the consumer's recovery of damages under the DTPA were entirely offset by the amount awarded to the opposing party. In such situations the supreme court held that the consumer is entitled to attorneys' fees based on his recovery of damages under the Act. *McKinley,* 685 S.W.2d at 9; *Matthews,* 685 S.W.2d at 650.

We believe that in order to be a "prevailing party" who is entitled to attorneys' fees under the DTPA, a party must "recover" money damages or something of value under the DTPA. *See Leyendecker & Associates, Inc. v. Wechter,* 683 S.W.2d 369, 374 (Tex. 1984); *IFG Leasing Co. v. Ellis,* 748 S.W.2d 564, 567 (Tex.App.—Houston [1st Dist.] 1988, no writ). In the present case Bien did not "recover" damages or anything of value under the DTPA. Under these circumstances, we do not interpret the DTPA as allowing Bien to receive the greater recovery of exemplary damages under his common law theory of recovery, which does not provide for attorneys' fees, and then also recover attorneys' fees under the DTPA for the same conduct and damages.

■ Bien also relies on that portion of section 17.43 of the DTPA which states that the remedies provided by the DTPA "are in addition to any other procedures or remedies provided for in any other law. . . ." TEX.BUS. & COM.CODE ANN. § 17.43 (Vernon 1987). To circumvent the remaining portion of section 17.43, which reads: "provided, however, that no recovery shall be permitted under both

[the DTPA] and another law of both actual damages and penalties for the same act or practice," *id.*, Bien would have us distinguish between the terms "theory of recovery" and "theory of measure of damages." Bien apparently claims that the award of damages by the trial court was an application of the measure of damages only and was not an exhaustion of the remedies or recovery to which he was entitled under the DTPA, *i.e.*, recovery of attorneys' fees, and to which he was entitled in addition to the damages. Such distinction is without merit under the circumstances of this case. The judgment awarded Bien all the relief to which he was entitled. Accordingly, his cross-point is overruled.

The judgment of the trial court is affirmed.