**NORTHWESTERN RESOURCES CO., Appellant,**

v.

**Rodney BANKS, Appellee.**

**No. 10–98–218–CV.**

Court of Appeals of Texas, Waco.

Oct. 20, 1999.

---

10. *See Ex parte Brosky,* 863 S.W.2d at 788.

Ashton G. Cumberbatch, Jr. & Patricia D. Pope, McGinnis Lochridge & Kilgore L.L.P., Austin, for appellant.

Amy Grubbs Thomas, Mexia, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## O P I N I O N

BILL VANCE, Justice.

This appeal is from a bench trial in which Northwestern Resources Company ("NWR") was found to have racially discriminated against its former employee, Rodney Banks ("Banks"), in violation of the Texas Commission on Human Rights Act ("TCHRA"). *See* TEX. LABOR CODE ANN. §§ 21.001–.306 (Vernon 1996 & Supp. 1999). In two issues, NWR asserts that the evidence is legally and factually insufficient to establish either "disparate treatment" or "disparate impact" under the TCHRA. *See id.* We will affirm the judgment.

## TCHRA

The TCHRA provides:

**§ 21.051. Discrimination by Employer**

An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:

(1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or

(2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

*Id.* § 21.051. Subsection (1) concerns "disparate treatment" claims; subsection (2) concerns "disparate impact" claims. The court's judgment does not specify which subsection it is based upon. Thus, if the evidence supports either theory, the judgment must be affirmed.

## "FITNESS FOR DUTY POLICY"

NWR's employee handbook outlines a "Fitness for Duty Policy" ("the Policy") which states in pertinent part:

I. *POLICY:*

It is the policy of Northwestern Resources Co. (Company) in order to have a work environment free from the ill effects of drug and alcohol use, to prohibit employees from using, possessing or being under the influence of nonprescribed drugs or alcohol while on or using Company property or while representing the Company.

II. *OBJECTIVE:*

To enhance the safety and improve the security of all persons on Company

property and to protect and preserve all Company property.

...

## V.  POLICY PROVISIONS:

A.  On-duty use and influence of drugs and alcohol.

Other than as directed by a treating physician, employees may not use, possess, be under the influence of, or offer to others any dangerous drug, controlled substance or alcohol while on duty, during meal breaks, or while using Company property.  Employees shall not report for work or represent the Company while under the influence of drugs or alcohol.  Violations of this provision may result in disciplinary action up to and including termination.

...

E.  Voluntary rehabilitation in lieu of screening (first offense).

Employees who have been scheduled for a first offense screening under Section D may volunteer for immediate participation in a Company approved Alcohol and Drug Abuse Rehabilitation Program in lieu of proceeding with the screening. . . .

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The court made findings of fact and conclusions of law.  The essential findings of fact are:

6.  The Fitness for Duty Policy sets forth Company approved rehabilitation as a consequence of a first offense positive screening results or voluntary, Company approved rehabilitation may be entered into in lieu of screening, but constitutes a first offense.

...

8.  Banks' voluntary entry into a Company approved drug rehabilitation in 1993 under an employee benefit provided under NWR's Group Health Plan was abruptly cut short at 7 days and NWR misrepresented that there was a $10,000 limitation on the health plan coverage and misrepresented that the limit had been exhausted.

9.  Banks' admission into a totally inadequate Company approved rehabilitation program could not constitute a first offense under NWR's Fitness for Duty Policy.

10.  Termination under NWR's Fitness for Duty Policy through 1996 consisted of approximately 1.5% of NWR's white employees and approximately 10% of NWR's minority employees.

11.  Banks is the only NWR employee terminated under the Fitness for Duty Policy who never had a positive drug screen.

12.  Banks was terminated for alleged violations of NWR's Fitness for Duty Policy, while whites were allowed to resign their position for alleged violations of the Policy.

13.  There are weaknesses, implausibilities, inconsistencies or contradictions in NWR's proffered legitimate reason for its action against Banks.

14.  Circumstantial evidence supports a reasonable inference that race was a motivating factor in NWR's decision to terminate Banks' employment.

The court entered a conclusion of law stating: "Circumstantial evidence allows this Court to make a reasonable inference that race was a motivating factor for NWR's decision to discharge Banks."

## STANDARD OF REVIEW

■ ■  In conducting a no-evidence review, we look at the evidence and inferences supporting the court's findings and disregard evidence and inferences to the contrary.  *See  Texarkana  Memorial*

*Hosp., Inc. v. Murdock,* 946 S.W.2d 836, 838 (Tex.1997). If there is more than a scintilla of evidence supporting the findings, the no-evidence challenge fails. *Id.* In conducting an insufficient-evidence review, we look at all of the evidence to determine if the findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). These standards are the same for a bench trial or a jury trial. *Ex parte Thomas,* 956 S.W.2d 782, 786 (Tex.App.— Waco 1997, no pet.).

### THE EVIDENCE

Banks began working for NWR in 1988. In January of 1993, Banks admitted to his supervisor, Steve Gilliam, that he had a cocaine problem.[1] He told Gilliam that he had spent most of his $1,100 paycheck on "crack" cocaine, using all of the drugs himself within a few days. Gilliam suggested that Banks visit the DePaul Center in Waco. Banks did and shortly thereafter checked into DePaul's drug rehabilitation program. Banks testified that he was told that the program was for 28 days, but he left after seven days when he was informed that his insurance would not pay for further treatment. Banks maintains that he left the program because he was told by NWR that the insurance coverage of $10,000 had been depleted.[2]

NWR maintains that Banks checked himself out of DePaul. It introduced nurses' notes from the day before he was discharged indicating that Banks had stated that he was "not interested in working the program ... and didn't care what he did because he was going home tomorrow."

Banks did not attend the recommended "aftercare" programs.

Upon returning to work, Banks was required to undergo random drug testing. He asserts that he was tested five times in the seven or eight months following his treatment at DePaul, including two times when he was off duty; NWR produced evidence of three tests, one of which was administered while Banks was off duty. It is undisputed that Banks never tested positive for drug use.

On Saturday, August 13, 1994, Banks failed to appear for work. According to Banks, he was unable to contact Gilliam that morning concerning his absence because the office staff did not work on Saturdays and the supervisors were out "in the field." He phoned Gilliam at home that evening, explaining that he had missed work because of a fight with his girlfriend and that he also needed Sunday off to go to church. Gilliam gave him a retroactive vacation day for Saturday and another vacation day for Sunday. Banks testified that during the phone conversation, he admitted to having "slipped" by using cocaine again after his discharge from the DePaul Center. He asked Gilliam to resume the random drug testing because it helped him avoid cocaine use. Banks denied telling Gilliam that he had missed work that day because of drug use. He said that Gilliam told him that he would check with Floyd Walters, NWR's human resources manager, about restarting random drug testing.

Gilliam testified that during their phone conversation, Banks told him of his fight with his girlfriend and of his desire to resume drug testing. Gilliam also testified

---

1. Banks went to Gilliam's home on a Sunday evening after several days of heavy cocaine use.

2. Banks testified that he phoned Gilliam from the DePaul Center. Gilliam told him that he must have exhausted his benefits and instructed him to return to work. Gilliam testified that he spoke with Floyd Walters, NWR's human resources manager, about the situation and was told that the insurance limit was $10,000.

   The "History and Progress Notes" from the DePaul Center indicate that Banks told his doctor that he was being discharged because his insurance had run out.

   Mike Weaver, a representative of the insurance company which had provided coverage for NWR, testified that he was not aware of a $10,000 limit on benefits.

that Banks told him that "he had gone to Mexia and bought some drugs and that he had him (sic) all messed up and that was basically the reason he couldn't come to work." Gilliam told Banks that he would speak with Walters.

When Banks reported for work Monday morning, he was called into a meeting with Gilliam and Walters. Walters told Banks he was being fired for violating the Policy. Banks testified that he requested a drug test, as provided under the Policy, but was refused.[3] NWR maintains that it fired Banks because his admitted drug use was a second offense under the Policy.[4]

Banks filed for unemployment benefits, and the Texas Employment Commission ("TEC") determined that there was no evidence that Banks had violated the Policy by using, possessing, or being under the influence of drugs while on duty. It further found that Banks' admission of past drug use was not a violation of the Policy. He also filed a complaint with the Texas Commission on Human Rights. In the complaint, Banks alleged that "three white males, namely Kirk Hempel, Wade Wiley, and William Allison, were sent to drug rehab for the full duration allowed by insurance and were not drug tested but one time after completing the program." The Commission eventually issued a "right-to-sue" letter. TEX. LABOR CODE ANN. §§ 21.208, 21.252–.253 (Vernon 1996).

## DISPARATE TREATMENT

■ In its first issue, NWR asserts that there is no evidence or insufficient evidence of disparate treatment. In a disparate treatment case, the plaintiff must first establish a *prima facie* case of discrimination. *Farrington v. Sysco Food Servs., Inc.,* 865 S.W.2d 247, 251 (Tex. App.—Houston [1st Dist.] 1993, writ denied) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973)); *see also Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).[5] The burden then shifts to the employer to articulate a valid, nondiscriminatory reason for the termination. *Id.* The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the employer's articulated reason is a pretext and that intentional, unlawful discrimination was the true reason for the termination. *Id.* Direct evidence of an employer's discriminatory intent is rare, and plaintiffs ordinarily prove pretext by circumstantial evidence. *LaPierre v. Benson Nissan, Inc.,* 86 F.3d 444, 449 (5th Cir.1996) (citing *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989, 993 (5th Cir.1996) (age discrimination)).

The court found that Banks made a *prima facie* case of discrimination and that NWR articulated a "legitimate, nondiscriminatory" reason for Banks' termination. NWR does not challenge the court's finding of a *prima facie* case. Thus, the only question is whether the evidence supports the court's finding that Banks met his burden to show by a preponderance of the evidence that NWR's articulated reason was a pretext and that intentional, unlawful racial discrimination

3. Walters testified that Banks was terminated for using drugs, having twice confessed to cocaine use. He testified that Banks did not ask for a drug test on the day he was fired, but on cross-examination admitted that Banks had asked for a test, but "technically [Banks] wasn't an employee" at that point.

4. NWR agrees that there is no direct evidence that Banks used, possessed, or was under the influence of cocaine while on duty. However, it presented evidence from a toxicologist that if a person used $1,000 to $2,000 worth of cocaine within a seven-day period, the after-effects could continue for up to a week.

5. The TCHRA was drafted to correlate with federal law; thus, Texas courts look to analogous federal court decisions interpreting parallel provisions of Title VII of the Civil Rights Act of 1964. *Gold v. Exxon Corp.,* 960 S.W.2d 378, 380 (Tex.App.—Houston [14th Dist.] 1998, no pet.); *Farrington v. Sysco Food Servs., Inc.,* 865 S.W.2d 247, 251 (Tex.App.—Houston [1st Dist.] 1993, writ denied); *Stinnett v. Williamson County Sheriff's Dept.,* 858 S.W.2d 573, 576 (Tex.App.—Austin 1993, writ denied).

was the true reason for his termination. *See id.*

NWR lists five arguments Banks made at trial to show pretext. Banks argued that similarly situated whites:

(1) were not terminated after violating the Policy, while he was terminated without ever committing a first or second offense of the Policy;

(2) were not drug-tested following their release from a drug rehabilitation program as often as he was tested following his release from the rehab program;

(3) were not drug-tested on their days off;

(4) were allowed to resign after testing positive for drugs, while he was not; and

(5) were not denied full rehabilitation.

NWR also refers to evidence that several white and non-white employees were dealt with under the Policy. It sets forth facts in its brief that it contends show that no distinctions were made based on race: Banks was randomly tested three to five times in the nineteen months between his rehab and his termination; white employees were randomly tested three times within similar time frames.

Banks responds that many of the employees named by NWR are "irrelevant" to his case because his TCHRA complaint named only three white men—Hempel, Wiley and Allison—who had been tested only once after completing a rehab program. Banks takes issue with NWR's assertion that he was tested three to five times in nineteen months because all of his

tests were within the first eight months after he left DePaul. In contrast, the white employees were initially tested just one time. Banks argues that the subsequent tests on these men were given in quick succession many months later at a time when NWR would have anticipated his discrimination complaint.[6]

Banks also refers to Rick Gray, second highest ranking person at the mine, who had been confronted by management about his marijuana use. Carroll Embry, the mine manager, testified that Gray had been fired and had not received preferential treatment. Banks, however, cites to Embry's cross-examination testimony in which he stated that Gray was allowed to resign rather than being fired. Banks argues that although Gray had been confronted with his drug use, had attended rehab, and had subsequently tested positive for drugs, he was allowed to resign. In comparison, Banks argues that he did not have a first or second offense under the Policy, was refused a drug test allowed under the Policy, and was not allowed to resign.

Walters testified that three other NWR employees had been subjected to random drug testing on their days off, just as Banks had been. On cross-examination, however, Walters testified that two had been tested while attending out-patient rehab and one had been tested because of an on-site accident. Walters stated that none of the employees, who were white, had been tested during a seven-day off-duty period as had Banks. He testified that Banks' testing had been unique due to his circumstances.[7]

---

**6.** Banks was terminated August 15, 1994. Allison was initially tested on May 12, 1993. He was subsequently tested on October 7 and October 26, 1994. Hempel was initially tested on May 20, 1993. He was subsequently tested on September 27 and October 5, 1994. Wiley was tested on March 24, 1993 and on November 14, 1994.

**7.** Banks testified that he was tested five times in the seven or eight months following his stay at the DePaul Center. He testified that

two of these tests were required on days when he was off duty. NWR produced three test results, one of which was taken during a three-day-off period. In a deposition, Gilliam testified that he had required Banks to be tested during a seven-day-off period because "[a] seven day off period is a pretty long time for individuals to be off, and I decided to have him tested right in the middle of his seven days off just to break the ... pattern of when he was doing it." On redirect examination,

Considering only the evidence and inferences supporting the court's findings, we find more than the necessary "scintilla of evidence." *Texarkana Memorial Hosp.,* 946 S.W.2d at 838. Taking all of the evidence into consideration—giving deference to the court's determination of the credibility of the witnesses and the weight to be given their testimony—we cannot say that the findings are so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain,* 709 S.W.2d at 176; *Tate v. Commodore County Mut. Ins. Co.,* 767 S.W.2d 219, 224 (Tex.App.—Dallas 1989, writ denied). We overrule issue one.

## DISPARATE IMPACT

Because sufficient evidence supports the court's findings under a disparate-treatment theory, we need not reach NWR's second issue on the sufficiency of the evidence to support Bank's disparate-impact theory.

We affirm the judgment.

Gilliam testified that he was not certain whether he had required Banks to be tested during a three- or seven-day-off period. Banks argues that Gilliam's testimony either indicates that he was tested more frequently than NWR records reveal or that the court was entitled to believe Gilliam's deposition testimony over his trial testimony.