**CHECKER BAG COMPANY, a Division of Checker Food Products Company, and Checker Food Products Company, Appellants,**

v.

**Lee WASHINGTON d/b/a Country Fair Confections, Appellees.**

No. 10–98–332–CV.

Court of Appeals of Texas, Waco.

Aug. 30, 2000.

---

Michael W. Huddleston, J. Stephen Gibson, McCauley, MacDonald, Devin & Huddleston, P.C., Dallas, for appellant.

David N. Deaconson, Pakis, Giotes, Beard & Page, P.C., Waco, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

BILL VANCE, Justice.

Lee Washington, as Country Fair Confections, manufactured and sold pre-packaged cotton candy to retailers. He bought the bags in which he packaged his cotton candy from Checker Bag Company. In early 1996, a problem developed with the shelf-life of his cotton candy. Washington blamed the problem on the bags which he bought from Checker Bag and sued, alleging violations of the Texas Deceptive Trade Practices Act (DTPA) and breach of contract. He sought damages for lost profits, injury to business reputation, and the value of the defective bags. A jury found that Checker Bag had violated the DTPA and breached its contract with Washington. After Washington elected to recover on the DTPA theory, the court awarded him a judgment for damages in the amount of $1,396,000, attorney's fees of up to $130,000 (depending on how far an appeal was pursued), and pre- and post-judgment interest. Checker Bag brought this appeal.

In considering the twenty-four issues Checker Bag has presented for our review, we will determine that (1) Checker Bag's attacks on the legal and factual sufficiency of the evidence to support the judgment are unavailing, (2) Washington's recovery for both lost profits and injury to his business reputation does not necessarily constitute an impermissible double recovery, (3) the difference between the amount of damages found by the jury on the same element of damages in response to different theories of liability does not constitute an irreconcilable conflict in the verdict, and (4) Checker Bag's failure to request that the jury be instructed to disregard a cross-examination question which contained an alleged attack on the integrity of its attorney forfeits its right to complain about that issue on appeal. Because we find no error, we will affirm the judgment.

## I. BACKGROUND

Lee Washington operated a candy distributorship. At a customer's suggestion, he began Country Fair Confections in his father-in-law's garage in March, 1992. Washington concentrated on two main efforts—the manufacture and sale of pre-packaged cotton candy and the sale of bulk-popped popcorn. This appeal involves the cotton candy "arm" of Country Fair.

### Country Fair's main business: the manufacture of cotton candy

Cotton candy is made of sugar and flossing, which is a coloring and flavoring additive for the sugar. The ingredients are combined together in a machine, referred to as a "tornado," which melts the sugar into a liquid and spins it out into a pan. The spinning of the sugar causes it to cool into a light, fluffy string-like fiber along the edge of the pan. Workers physically

collect an individual-sized portion of the cotton candy from the pan with a wand and place it into a plastic bag. The plastic bag containing the cotton candy is then placed on a conveyer belt which carries it to a sealer machine. At the sealer machine, another worker feeds the open end of the bag into the machine to seal it closed. As the bags come off the sealer they are loaded into boxes for shipping.

Because cotton candy is made of melted sugar, it is highly sensitive to moisture. A cotton candy production line operates optimally within a narrow range of temperature and humidity. Washington attempted to keep the production area's temperature between 40 and 50 degrees and its humidity level between 35 and 45 percent. If the humidity rose above 50 percent, production had to stop. This sensitivity to moisture does not end after the cotton candy is produced. If the candy is exposed to moisture after production it absorbs the moisture, dissolving the fibrous structure and ultimately resulting in the candy's shrinking to a hard, powdery ball.

Cotton candy's susceptibility to moisture requires that a special emphasis be placed on the bag in which it is packaged. All plastic bags allow a certain amount of moisture to penetrate. Apparently, the concern with pre-packaged cotton candy is limiting that amount to an acceptable level to give the product a reasonable shelf-life in the retailer's store.

### Country Fair's search for a bag

One of the first decisions Washington faced was the choice of a bag in which to package his product. Originally, Washington copied the bag one of his competitors was using. However, he soon discovered why he had been asked to replace that competitor: the bag did not adequately protect the cotton candy from the moisture in the air as it sat on the shelf. Thus, he began a search for a new bag. In this search he contacted Checker Bag and spoke to Richard Wall. Wall recommended two different plastics to attempt to address the moisture problem. Ultimately, Wash-

ington began using a bag made from Mobil 150ASBX plastic film. From October 1992 until the summer of 1995, Washington bought the ASBX bag from Checker Bag for packaging his cotton candy.

Shortly after he started using the ASBX bag, though, Washington experienced some problems with it. In particular, the bag had a tendency to tear open around the hole at the top from which it was hung on display racks at the stores where it was sold. Wall recommended that Washington switch from the ASBX bag to a laminated bag, assuring Washington that it would provide the same moisture protection as the ASBX bag. According to Washington, he switched from the ASBX bag to a laminated bag, the 120OPP/60UBS bag (the 120 bag), to correct the problem with the marketing hole. A desirable side-effect of the change, though, was that the graphics on the bag could be enhanced. However, the 120 bag was too expensive for Washington to use, and he asked Wall to help him find another replacement bag.

Wall first suggested that Washington switch to a 70OP/100CP laminated bag, again assuring Washington that it would provide the same moisture protection. However, Checker Bag had difficulty producing bags for Washington made from this material, and Wall told Washington that he would have to switch materials yet again. Wall suggested that Washington try a bag made out of some material which Checker Bag had acquired to manufacture a bag for another customer. After receiving assurances that bags from this material would also perform as the others had, Washington accepted the suggestion and began purchasing the new bags, the model 48PET. He received the first shipment of these bags on November 4, 1995.

### Country Fair's search for a market

Early on in the life of Country Fair, Washington determined that he would seek to become the cotton candy supplier for the Blockbuster Video rental chain. When he contacted the corporation in

1992, he was told that he needed to "grow" his business before he would be considered for that role. He was advised, however, that he could seek to market his product to individual franchises, *i.e.* stores that were not owned and controlled by the Blockbuster corporation. Even before Washington first spoke to Rich Wall about finding a better bag, he was supplying cotton candy to a Blockbuster franchise chain of between 25 and 30 stores. Washington used referrals from the first Blockbuster customer to get his cotton candy into other stores, ultimately selling directly to somewhere between 150 and 200 Blockbuster franchise stores. Washington also supplied cotton candy to other businesses, placing his product in theaters and convenience stores, and selling to small distributors who passed the cotton candy onto other video stores, schools, pools, ice arenas, car racetracks, and such.

In 1995, however, Washington had the opportunity to compete for the corporate Blockbuster account. Washington purchased some of his equipment and supplies from Liberto Management Company in Dallas. Liberto's manager, Rene LaWalling, was also one of Blockbuster's national account representatives. She assisted Blockbuster in making decisions on new products for sale in the confection area of their stores. When the Blockbuster corporate buyer decided to change cotton candy suppliers, LaWalling obtained test samples from three manufacturers, including Country Fair. Although the corporate buyer chose another brand for national distribution, he allowed Blockbuster's central zone manager to deviate from that selection. The central zone manager chose Washington's product for distribution to her stores based on its performance in LaWalling's tests. Thus, in the late summer/early fall of 1995, Washington began supplying cotton candy to some 450 Blockbuster corporate stores located in Texas, Oklahoma, Kansas, Missouri, Arkansas, Louisiana, Mississippi, Alabama, northern Florida, Colorado, Utah, and Idaho.

### The collapse of the bag leads to the collapse of the market

In early 1996, LaWalling called Washington and told him that there was a problem with his cotton candy at Blockbuster's Houston distribution center. Washington drove to Houston the next day and discovered that much of the cotton candy on hand there had begun to harden in the bags. At first, the problem was localized in Houston, but shortly thereafter it spread to all parts of the central zone. According to LaWalling, the life of the cotton candy in this bag was only five to ten days before it became hardened and unsaleable (compared to the minimum forty-five day shelf-life provided by the previous bags). As a result of the rapid deterioration of Washington's cotton candy, all of Country Fair cotton candy was removed from the Blockbuster stores, and Blockbuster made a "permanent decision ... to no longer purchase the Country Fair cotton candy."

Blockbuster was not the only Country Fair customer affected by the decline in the candy's shelf-life. Washington lost "many" other customers as well, including small distributors who supplied other retailers.

Washington attempted to determine what caused the problem in Country Fair's product. He closely examined and monitored the production equipment and facility. He "grilled" the Houston personnel to determine if the candy had been properly stored. In each instance, according to Washington, he was unable to find the source of the problem. His focus turned to the bag in which the cotton candy was packaged when he received a return from a Blockbuster customer which contained 71 bags of hardened candy and one bag that was "full and pretty." Upon investigating, Washington realized that the one good bag was packed in the pre–48PET bag. He immediately switched bags, ordering a substitute bag from Checker Bag.

In March 1996, Washington changed bag suppliers. According to Washington, since

he stopped using the 48PET bag, Country Fair cotton candy has consistently enjoyed a 45 to 60 day shelf-life.

### The lawsuit

Because he believed that Checker Bag had misrepresented to him that the 48PET bag would perform as well as the other bags he had used, Washington filed this suit against Checker Bag. He alleged that Checker Bag had violated the DTPA and had breached its contract with him by failing to supply bags that lived up to the representations made to him by Wall. After an eight day trial, the jury returned a verdict favoring Washington on both his DTPA and breach of contract theories, and awarded damages totaling $1,396,000 on his DTPA claim and $760,100 on his contract claim, plus up to $130,000 in attorney's fees. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

Checker Bag challenges the sufficiency of the evidence to support the jury's findings on liability, damages, attorney's fees, and the jury's failure to award it any damages on its counter-claim.

### A. Standard of review

■ In reviewing "no evidence" points of error, we consider only the evidence supporting the verdict and draw all inferences in the light most favorable to the verdict. *Southwestern Bell Mobile Systems, Inc. v. Franco*, 971 S.W.2d 52, 54 (Tex.1998); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). If there is more than a scintilla of evidence supporting the findings, the no-evidence challenge fails. *See Texarkana Memorial Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 838 (Tex.1997). We will sustain a no evidence point of error when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the

evidence establishes conclusively the opposite of the vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex.1998), *cert. denied*, 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999).

■ When considering a factual sufficiency challenge to a jury's verdict regarding an issue on which the appellant did not have the burden of proof, we must consider and weigh all of the evidence, not just the evidence that supports the verdict. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex.1998), *cert. denied*, 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Northwestern Resources Co. v. Banks*, 4 S.W.3d 92, 95 (Tex.App.—Waco 1999, pet. denied). We may not pass upon the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence would clearly support a different result. *Ellis*, 971 S.W.2d at 406–07; *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 634 (Tex.1986). We will set aside the verdict only if it is so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Ellis*, 971 S.W.2d at 407; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Reversal can occur because the finding was based on weak or insufficient evidence or because the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's contrary proof. William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence,"* 69 Tex. L.Rev. 515, 519 n. 11 (1991).

■ When we are called upon to review the factual sufficiency of the evidence to support a jury's failure to find a fact on which the challenging party bears the burden of proof we must sustain the failure to find unless, considering all the evidence, the finding is so contrary to the great weight and preponderance of the evidence as to be manifestly unjust. *See Ames v. Ames*, 776 S.W.2d 154, 158 (Tex.1989); *Cropper v. Caterpillar Tractor Co.*, 754 S.W.2d 646, 651–53 (Tex.1988). If we re-

verse a trial court's judgment for factual insufficiency, regardless of who had the burden of proof on the issue, we must detail all the evidence relevant to the issue and clearly state why the jury's finding is so against the great weight and preponderance of the evidence that it is manifestly unjust. *Ellis*, 971 S.W.2d at 407; *Ellis County State Bank v. Keever*, 888 S.W.2d 790, 794 (Tex.1994).

### B. Liability

■ Checker Bag complains that the evidence is legally and factually insufficient to support the jury's liability findings in issues 15 through 22. In cases where the judgment rests on multiple theories of recovery, an appellate court need not address all causes of action if any one theory is valid. *George Grubbs Enterprises, Inc. v. Bien*, 881 S.W.2d 843, 851 n. 7 (Tex. App.—Fort Worth 1994), *rev'd on other grounds*, 900 S.W.2d 337 (Tex.1995); *also Leonard & Harral Packing Co. v. Ward*, 883 S.W.2d 337, 345–46 (Tex.App.—Waco 1994), *rev'd on other grounds*, 937 S.W.2d 425 (Tex.1996), *aff'd on remand*, 971 S.W.2d 671 (Tex.App.—Waco 1998, no pet.). Because the judgment is based on Washington's recovery on his DTPA theory, we need not address the sufficiency of the evidence to support his contract claim unless his DTPA claim fails. *Id.* Similarly, we need address only one of his DTPA liability theories because either one would be sufficient to sustain the verdict. *Id.* Thus, we confine our discussion to Washington's DTPA laundry-list violation claim.

### 1. DTPA "laundry list" violations

■ The Deceptive Trade Practices Act contains a list, commonly referred to as the DTPA "laundry list," of actions declared to constitute false, misleading, or deceptive acts. Tex. Bus. & Com.Code Ann. § 17.46(b) (Vernon Supp. Pamph.2000); *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 385–86 (Tex.2000); *David McDavid Nissan, Inc. v. Subaru of America, Inc.*, 10 S.W.3d 56, 68 (Tex.App.—Dallas 1999, no pet.). Private parties are empowered to maintain an action for damages where those damages are caused by a laundry-list violation. Tex. Bus. & Com.Code § 17.50(a)(1) (Vernon Supp. Pamph.2000). To succeed in a DTPA laundry-list suit, the plaintiff must show that (1) he is a consumer, (2) the defendant engaged in false, misleading, or deceptive acts, (3) on which the plaintiff relied, and (4) these acts constituted a producing cause of the consumer's damages. *Id.; see Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 478 (Tex.1995). In issues 15 and 16, Checker Bag claims that the evidence is insufficient to support the jury's findings on the elements other than Washington's consumer status.

### a. False, misleading, or deceptive act

■ Checker Bag first challenges the factually sufficiency of the evidence to show that it engaged in a false, misleading, or deceptive act. The jury found that Checker Bag had (1) represented that the plastic bags had characteristics, uses, or benefits that they did not have, (2) represented that the plastic bags were of a particular standard, quality, or grade when they were of another, and (3) failed to disclose that the plastic bags would not have sufficient barriers to maintain the cotton candy even though it knew otherwise, with the intent to induce Washington into the transaction. Tex. Bus. & Com.Code Ann. § 17.46(5), (7), (23). Because a single violation of the laundry-list prohibitions can support a recovery, we need only determine if the evidence supports the jury's finding on one of these violations. *See Spradling v. Williams*, 566 S.W.2d 561, 564 (Tex.1978); *Hycel, Inc. v. Wittstruck*, 690 S.W.2d 914, 921 (Tex.App.—Waco 1985, writ dism'd w.o.j.).

■ Checker Bag contends Washington's evidence showing Checker Bag represented that the 48PET bag had the same moisture barrier as the model 150 is outweighed by other evidence. Both Washington and Mike Tawater, Country Fair's production manager, testified direct-

ly that Wall assured them that the 48PET bag would provide the same protection as the bags they had used earlier. Checker Bag does not point to any evidence which directly contradicts this testimony, be it testimony by Wall or otherwise.[1] Because Checker Bag has not directed us to any evidence which would overwhelm the testimony that Wall affirmatively assured Washington and Tawater that the 48PET bag would have the same characteristics as the prior bags, the jury's verdict is not so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Ellis,* 971 S.W.2d at 406–07; *Cain,* 709 S.W.2d at 176. Thus, the evidence is factually sufficient to support the jury's finding of a DTPA laundry list violation.

### b. Reliance

■ Next, Checker Bag challenges the factual sufficiency of the evidence to support the finding that Washington relied on a representation by Wall regarding the characteristics of the 48PET bag. Checker Bag did not complain to the trial court at any time that the evidence was factually insufficient to support a finding of reliance. Before a party may present a complaint to an appellate court, the record must show that the complaint was made to the trial court and that the trial court either ruled or refused to rule on it. TEX.R.APP. P. 33.1. Specifically, a complaint that the evidence is factually insufficient to support a jury finding must be raised in a motion for a new trial before it can be argued on appeal. TEX.R. CIV. P. 324(b)(2); *Fairfield Estates L.P. v. Griffin,* 986 S.W.2d 719, 723 (Tex.App.—Eastland 1999, no pet.); *Brush v. Reata Oil and Gas Corp.,* 984 S.W.2d 720, 725 (Tex.App.—Waco 1998, pet. denied). Thus, because Checker Bag

did not challenge the factual sufficiency of the evidence to support the finding that Washington relied upon the misrepresentation found by the jury in the trial court, it has waived any complaint about that finding. *Id.*

On the other hand, Checker Bag may be seeking to challenge the sufficiency of the evidence to support the jury's express finding that Checker Bag failed to disclose information it knew to be false intending to induce Washington to enter into a transaction he would not have engaged in otherwise.[2] TEX. BUS. & COM.CODE ANN. § 17.46(23). If so, we need not address this complaint because the judgment can be upheld on the alternative violations found by the jury, as discussed above. *Spradling,* 566 S.W.2d at 564; *George Grubbs Enterprises,* 881 S.W.2d at 851 n. 7.

### c. Causation

■ Finally, Checker Bag contends that the evidence is both legally and factually insufficient to support the jury's finding that its misrepresentation was a producing cause of any damages Washington sustained. Producing cause is an "efficient, exciting, or contributing cause, which in the natural sequence, produced [the] injuries or damages complained of[.]" *Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 182 (Tex.1995). There can be more than one producing cause. *Id.* The test is whether the defendant's act or omission was a substantial factor in bringing about an injury which would not otherwise have occurred. *Prudential Ins. Co. of Am. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995).

■ Viewed in the appropriate light, the evidence at trial establishes that Wash-

---

**1.** Checker Bag correctly points out that we consider all of the evidence when reviewing a factual sufficiency challenge and repeatedly urges this court to examine the entire record. However, it is Checker Bag's responsibility to point out those portions of the record which we should consider in reviewing their challenge. TEX.R.APP. P. 38.1(h). Although our

scope of review includes all of the evidence, that scope does not place an independent burden on us to search the record looking for support for an appellant's factual sufficiency challenge.

**2.** Checker Bag's brief on this point is unclear.

ington initially used bags which allowed him to guarantee a shelf life of 60 days for his cotton candy; that he accepted the 48PET bag on the basis of Wall's representation that it would perform as well as any of the other bags he had used; that after the first shipment of cotton candy in the 48PET bags the cotton candy started going bad long before the guaranteed shelf life and often even before it was unpacked from its shipping crate; that the problem was widespread in the distribution areas; that Washington and Tawater checked and rechecked the production facility to ensure that the temperature and humidity were within the proper range and that the production equipment was operating correctly; and that after Washington stopped using the 48PET bags the shelf-life for his product returned to its pre–48PET level. Checker Bag's expert testified that by its nature the 48PET bag would only provide at best one-third the moisture barrier the previous bags would. The evidence shows that the only change that occurred during the time that Washington was unable to obtain an acceptable shelf-life for his cotton candy was the change of the bag in which the product was packaged.

Accepting this evidence and all inferences flowing from it which support the verdict, we conclude that there is some evidence from which the jury could find the decreased shelf-life of the cotton candy was a result of the lower moisture barrier provided by the 48PET bag and that Washington would not have used that bag but for Wall's assurances about its quality and characteristics. *Ellis*, 971 S.W.2d at 406–07. Thus, there is some evidence that Checker Bag's misrepresentation regarding the quality of the 48PET bag was a producing cause of the damages Washington suffered when the bag failed to perform as Checker Bag said it would. *Id.*

Checker Bag also claims that finding its misrepresentation of the quality and characteristics of the 48PET bag was a producing cause of injury to Washington is contrary to the great weight and preponderance of the evidence. Checker Bag contends that the evidence shows the problems with the cotton candy were probably caused by other factors, such as the failure to get a proper seal on the bag once the candy was placed inside of it, the failure to control the humidity at the production facility and in the air sealed inside the bag, or unexpected exposure to heat and light during transit or while the candy was in storage with the retailer. Although there is evidence in the record which shows that each of these factors can be a threat to cotton candy, there is also evidence which tends to show that each of these other factors was accounted for by Washington when he was trying to determine what was causing the problem with his product. Given this conflicting evidence, the jury's finding is not so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust. *Ellis*, 971 S.W.2d at 406–07; *Cain*, 709 S.W.2d at 176. Thus, the evidence is factually sufficient to support the jury's finding that Checker Bag's misrepresentation was a producing cause of Washington's damages. *Id.*

We have considered and rejected each of Checker Bag's attacks on the evidence supporting the jury's findings on Washington's DTPA laundry-list-violation theory of liability. Therefore, we find issues 15 and 16 to be without merit.

### 2. Other liability issues

Checker Bag also contests whether the evidence is legally and factually sufficient to support the jury's finding that it breached a warranty (issues 17 and 18), whether the evidence is legally and factually sufficient to support the jury's finding that it breached a contract (issues 19 and 20), and whether the evidence is legally and factually sufficient to support the jury's finding that its violation of the DTPA was "knowing" (issues 21 and 22). Under these issues it also contends that a disclaimer of warranties in the sales documents prevents Washington from succeeding on either his breach-of-warranty DTPA claim

or his contract claim. However, the judgment is fully supported by the jury's liability finding on Washington's DTPA laundry-list-violation claim. Thus, we need not address the alternate liability theories or the attacks on those findings. *Spradling*, 566 S.W.2d at 564; *Leonard & Harral Packing Co.*, 883 S.W.2d at 345–46; *George Grubbs Enterprises*, 881 S.W.2d at 851 n. 7. Additionally, although the jury found that Checker Bag had knowingly violated the DTPA, it awarded no damages as a result of this finding, rendering the finding immaterial. *Hancock v. City of San Antonio*, 800 S.W.2d 881, 885 (Tex. App.—San Antonio 1990, writ denied). Thus, we do not reach Checker Bag's issues 17 through 22.

## C. Damages

In issues 1 through 6 and 9 through 14, Checker Bag attacks the sufficiency of the evidence to support the amounts awarded as business reputation injury damages and lost profits. Again, although Checker Bag assails the finding on all theories of liability, we will confine our discussion to the issues that relate to the DTPA laundry-list-violation theory of recovery. *Spradling*, 566 S.W.2d at 564; *Leonard & Harral Packing Co.*, 883 S.W.2d at 345–46; *George Grubbs Enterprises*, 881 S.W.2d at 851 n. 7.

### 1. Business reputation injury damages

 In issues 1 through 6, Checker Bag argues that the evidence is legally and factually insufficient to support the jury's award of business reputation injury damages. It claims that the evidence is insufficient because injury to business reputation is synonymous with injury to credit reputation under our 1975 decision *Sterling Projects v. Fields* and there is no evidence to show that Washington's credit reputation was injured. *Sterling Projects v. Fields*, 530 S.W.2d 602, 605 (Tex.Civ.

App.—Waco 1975, no writ). However, Checker Bag misreads our *Sterling Projects* decision. In *Sterling Projects*, "under the facts of [that] case," business reputation and credit reputation were treated as "almost" synonymous by the parties, so we treated them that way as well. *Id.* (emphasis added). We did not hold that the two *are* synonymous and did not require a showing of loss of credit reputation to establish damage to business reputation. *See id.* Thus, Checker Bag's claim that the absence of any proof of loss of credit reputation is fatal to Washington's claim for loss of business reputation is incorrect, and we find no merit in the parts of issues 1, 3, and 5 dealing with both the legal and factual sufficiency of the evidence to support these findings, and all of issues 2, 4, and 6.[3]

### 2. Lost profits

The jury found that Washington suffered lost past profits in the amount of $400,000 and lost future profits in the amount of $636,000. Checker Bag attacks the legal and factual sufficiency of the evidence to support these findings in issues 9 through 14. We again will only address those issues that relate to the DTPA laundry-list violation on which we uphold the liability findings.

#### a. Proof requirements

 Lost profits may be recovered if they are proved with reasonable certainty. *Formosa Plastics Corp. U.S.A. v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 50 (Tex.1998). The "reasonable certainty" requirement is intended to be flexible enough to accommodate the variety of circumstances which give rise to lost profits claims. *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). As established by the Supreme Court:

> The generally accepted rule is that, where it is shown that a loss of profits is

---

**3.** Issues 1, 3, and 5 also include claims that the recovery for business reputation damages is necessarily duplicative of the recovery for loss profits. We deal with this argument below.

the natural and probable consequences of the act or omission complained of, and their amount is shown with sufficient certainty, there may be a recovery therefor; but anticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness. (citation omitted). The rule as announced by the decisions of the courts of this state is summarized ... as follows: "In order that a recovery may be had on account of loss of profits, the amount of the loss must be shown by competent evidence with reasonable certainty. Where the business is shown to have been already established and making a profit at the time when the contract was breached or the tort committed, such pre-existing profit, together with other facts and circumstances, may indicate with reasonable certainty the amount of profits lost. It is permissible to show the amount of business done by the plaintiff in a corresponding period of time not too remote, and the business during the time for which recovery is sought. Furthermore, in calculating the plaintiff's loss, it is proper to consider the normal increase in business which might have been expected in the light of past development and existing conditions." (citation omitted).

*Id.* (quoting *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098–99 (1938)). Largely speculative profits are not recoverable. *Id.* Among those claims which are too speculative to support a recovery are claims based on (1) an activity dependent on uncertain or changing market conditions, (2) chancy business opportunities, (3) promotion of untested products, (4) entry into unknown or unviable markets, and (5) the success of an unproven enterprise. *Id.; Cal–Tex Lumber Co., Inc. v. Owens Handle Co., Inc.*, 989 S.W.2d 802, 817 (Tex.App.—Tyler 1999, no pet.).

#### b. Legal sufficiency of the evidence

Checker Bag first argues the evidence is legally insufficient because there is no evidence to support the theory that Washington would have obtained the Blockbuster national account. Washington presented the jury with two different amounts representing the profits lost due to the loss of the Blockbuster account. The first amount, $3,999,000 represented Washington's claim of profits he stood to gain if he could have secured the Blockbuster national account. The second figure, $1,050,541 represented the profits Washington claimed were lost as a result of the loss of the Blockbuster zone and franchise stores to which he was already selling. The jury awarded damages of $1,036,000, far less than the amount Washington claimed would have flowed from the acquisition of the Blockbuster national account. Thus, the sufficiency of the evidence to support the certainty of the profits to be derived from the Blockbuster national account is irrelevant to this appeal. *Spradling*, 566 S.W.2d at 564; *Leonard & Harral Packing Co.*, 883 S.W.2d at 345–46; *George Grubbs Enterprises*, 881 S.W.2d at 851 n. 7.

■ Checker Bag next contends that the evidence is legally insufficient because Washington's claim that he could sell to any Blockbuster corporate store was based solely on speculation and conjecture. Checker Bag claims the evidence establishes that cotton candy is no longer a product approved for distribution to the corporate stores through the regional distributor by the Blockbuster corporation and, so, Washington's claim of lost profits was based on only an unfounded hope of future success, which is insufficient to support recovery. *See Texas Instruments*,

877 S.W.2d at 280. Additionally, because Washington's economic expert, Jack Stowe, Jr., assumed that he would have retained the central zone account when calculating lost profits, Checker Bag argues that his testimony is the legal equivalent of no evidence as it was based on an assumption which was contrary to the evidence. *See General Motors Corp. v. Sanchez,* 997 S.W.2d 584, 596 (Tex.1999); *Burroughs Wellcome Co. v. Crye,* 907 S.W.2d 497, 499–500 (Tex.1995).

However, there is some evidence to support the claim, and Stowe's assumption, that Washington would have continued to have the opportunity to supply cotton candy to the Blockbuster corporate stores in the central zone but for the problem with the shelf-life. Brian Kuterbach, the head of purchasing of food items for nearly 4,000 Blockbuster corporate stores, testified that Blockbuster's decision to stop purchasing cotton candy on a corporate/regional level was based on the problems that developed with Washington's cotton candy in 1996. Furthermore, Kuterbach confirmed that individual stores still bought cotton candy from regional suppliers and that, but for the problems in 1996, Blockbuster would "have cotton candy ... in a bigger way than we do today." He also testified that the individual zone's management could make the decision to continue to sell cotton candy in their area. Thus, we find some evidence to support the assumption that Washington could have retained the central zone account. Using that assumption, Stowe's testimony about Washington's claim of lost profits is based on more than "hope." *Martinez,* 977 S.W.2d at 334; *Franco,* 971 S.W.2d at 54. Because there is some evidence that Stowe's assumptions were reasonable, we cannot agree with Checker Bag's contention that his testimony is no evidence of the lost profits Washington sustained. *See Sanchez,* 997 S.W.2d at 596; *Crye,* 907 S.W.2d at 499–500. Therefore, we reject Checker Bag's attacks on the legal sufficiency of the evidence to support the award of lost profits.

### c. Factual sufficiency of the evidence

Checker Bag's attack on the factual sufficiency of the evidence to support the lost profits award concentrates on Stowe's analysis. Checker Bag claims that his analysis was insufficient because he did not take into account the problems that Washington may have faced when increasing production to meet increased demand or the effect of the large amount of short term debt used to finance Washington's operation, failed to account for the value of Washington's time to the business, and used an unreasonably high profit margin when projecting potential profits over time. All of these criticisms of Stowe's analysis were presented to the jury in the course of the testimony by Dr. James W. Henderson, Checker Bag's economic expert.

Stowe based his testimony and conclusions on a detailed analysis of Country Fair's performance over four years, including data composed of nearly three years of actual weekly production records and over four years of actual monthly sales records. He explained in detail how he used those figures to calculate a specific unit cost based on the objective, historical facts, figures, and data contained in the Country Fair records. He arrived at his projected lost profits through a comparison of the unit cost and the historical sales data, projected out over time. We find his testimony is sufficient support for the jury's verdict, and is not overwhelmed by Checker Bag's contrary evidence. *Ellis,* 971 S.W.2d at 406–07; *Cain,* 709 S.W.2d at 176. Thus, we conclude that Checker Bag's challenge to the factual sufficiency of the evidence to support the lost profits award must fail.

We have found Checker Bag's attacks on the sufficiency of the evidence to support the jury's award of lost profits to be unavailing. Therefore, we conclude that issues 9 through 12 are without merit. We do not reach issues 13 and 14 because they are directed to the jury's damages findings

based on the breach-of-contract liability findings.

### D. Attorney's fees

▮ To justify an award of attorney's fees in a DTPA case, "the plaintiff must prove that the amount of fees was both reasonably incurred and necessary to the prosecution of the case at bar, and must ask the jury to award the fees in a specific dollar amount, not as a percentage of the judgment." *Arthur Andersen & Co. v. Perry Equipment Corp.*, 945 S.W.2d 812, 819 (Tex.1997). When considering what amount to award, the factfinder should be guided by the factors from the Rules of Professional Conduct governing fees. *Id.* at 818; TEX. DISCIPLINARY R. PROF. CONDUCT 1.04(b), reprinted in TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998) (State Bar Rules, art. X, § 9).

▮ The jury awarded Washington attorney's fees totaling $130,000. Checker Bag complains that the evidence supporting the award is legally insufficient because Washington failed to adduce evidence on all eight of the factors listed in Rule 1.04(b). However, there is no requirement that all eight of the factors be supported by evidence. *See Arthur Andersen*, 945 S.W.2d at 818–19. Washington's attorney's testimony addressed some of the factors and is legally sufficient to support an award of attorney's fees. *Martinez*, 977 S.W.2d at 334; *Franco*, 971 S.W.2d at 54.

Checker Bag also complains that Washington's attorney testified about appellate fees for an appeal to the Texas Supreme Court with reference to the old writ of error practice instead of the post-September 1997 petition for review practice. *Compare* TEX.R.APP. P. 130–136, 49 TEX. B.J. 556 (1986, amended 1997) (governing procedures for filing applications for writs of error), *with* TEX.R.APP. P. 53–56 (governing procedures for filing petitions for review). According to Checker Bag, this testimony necessarily involved an overesti-

mation of the time needed to defend an appeal to the Supreme Court. When reviewing legal sufficiency challenges, we only consider the evidence and inferences which support the finding. *Keever*, 888 S.W.2d at 794. Checker Bag asks us to find the evidence legally insufficient based on an inference which is contrary to the finding—that responding to a petition for review requires less time than responding to an application for a writ of error—and which is unsupported by the record. This we will not do. *Id.*

Washington's burden was to show that the fees were "reasonably incurred and necessary to the prosecution of the case." *See Arthur Andersen*, 945 S.W.2d at 819. We conclude that his attorney's testimony satisfied this requirement. Thus, we find issue 24 to be without merit.

### E. Jury's refusal to award damages on counter-claim

▮ In its final attack on the sufficiency of the evidence, Checker Bag complains that the jury failed to award it any money on its counter-claim for money owed on the last shipments of bags to Washington. Two issues were submitted to the jury regarding Checker Bag's counter-claim. Question 10 asked whether Washington "owe[d] a monetary debt" to Checker Bag, to which the jury answered "Yes." Question 11, predicated on an affirmative answer to Question 10, asked the jury to find a "sum of money, if any, if paid now in cash, [that] would fairly and reasonably compensate [Checker Bag] for services or products provided" to Washington. The jury answered this question "$0.00." In issue 7, Checker Bag contends that this answer is contrary to the overwhelming weight and preponderance of the evidence.

Checker Bag claimed that Washington owed it more than $10,000. Washington acknowledged that he never paid the final $8,833.62 balance due to Checker Bag. He claimed, though, that he was entitled to offsets against the amount due but never

specified a certain amount that he believed that he was entitled to claim. Checker Bag acknowledged that Washington was entitled to some amount of offset, but also did not specify the amount which should be credited to its account. The jury found that the bags did not perform as Checker Bag represented they would. Considering all of the evidence relevant to the issue, we conclude that the jury's finding that "$0.00" would fairly and reasonably compensate Checker Bag for the underperforming bags is not manifestly unjust, nor does it shock the conscience or clearly demonstrate bias. *Cropper,* 754 S.W.2d at 651–53; *Pool,* 715 S.W.2d at 635. Therefore, we find no merit in issue 7.

### III. DUPLICATIVE DAMAGES

In subparts of issues 1, 3, and 5, Checker Bag contends that awarding damages for both lost profits and injury to business reputation constitutes an impermissible double recovery. Checker Bag argues:

> To award damages for loss of profit and damages for loss of business reputation is "impermissibly duplicitous" because the loss of business reputation is necessarily subsumed in any recovery for lost profits. *C.A. May Marine Supply Co. v. Brunswick Corp.,* 649 F.2d 1049, 1053 (5th Cir.1981). Country Fair is still an on-going business. [record cite omitted] Any diminished business reputation is inevitably reflected by decreased sales and resulting lower profits. *Lehrman v. Gulf Oil Corp.,* 500 F.2d 659, 664 (5th Cir.1974). Consequently, an award for lost profits adequately supported by the evidence necessarily includes adequate compensation for any loss of business reputation.

Business reputation or "goodwill" is usually considered to be a part of the value of a business. *Nelson v. Data Terminal Systems, Inc.,* 762 S.W.2d 744, 748 (Tex. App.—San Antonio 1988, writ denied). The ability of the business to make a profit is reflected in its value. *City of San Antonio v. Guidry,* 801 S.W.2d 142, 150 (Tex.

App.—San Antonio 1990, no writ). Thus, the recovery of both lost profits and damage to business reputation could easily be duplicative. *See id.; C.A. May Marine Supply,* 649 F.2d at 1053.

However, damage awards are only duplicative if they compensate the plaintiff for the same injury. *Waite Hill Services, Inc. v. World Class Metal Works, Inc.,* 959 S.W.2d 182, 184 (Tex.1998); *see Hart v. Moore,* 952 S.W.2d 90, 97 (Tex. App.—Amarillo 1997, pet. denied). Thus, a plaintiff could recover for both lost profits and injury to business reputation if the damages covered different time periods. Kenneth M. Kolaski, *Measuring Commercial Damages via Lost Profits or Loss of Business Value: Are these Measures Redundant or Distinguishable?,* 18 J.L. & Com. 1, 21 (1998); *see Guidry,* 801 S.W.2d at 150 (stating that recovery of both lost profits and loss of business value for the same time period would be duplicative). Awards that are for different time periods compensate a plaintiff for different lost profits. Kolaski, at 22. Similarly, awards that are for different markets or activities compensate the plaintiff for different losses. *See id.; see also Texas Instruments,* 877 S.W.2d at 280 (acknowledging that damages to a particular "business activity" may be compensable by an award of lost profits). Thus, recovery for both lost profits and injury to business reputation are not *necessarily* duplicative, but may be so depending on the evidence.

Checker Bag has not attempted to show the evidence establishes that the awards to Washington for lost profits and injury to business reputation actually compensate him for the same injury. The record tends to support that Washington presented the case to the jury dividing up his business into two separate markets—Blockbuster Video customers and all of his other customers. There is some evidence in the record to support a finding of different amounts of losses attributed to these two markets. Although the jury was not

instructed to avoid including any amount awarded for lost profits in its award for injury to business reputation, Checker Bag did not object to the lack of that instruction in the charge and does not complain about the charge on appeal. Therefore, we conclude that Washington's recovery for injury to his business reputation is not necessarily a double recovery, and reject Checker Bag's matter-of-law contention that it is automatically included in the recovery for lost profits.

Checker Bag also claims that the separate awards cannot be upheld on the basis of separate findings of violations of the DTPA. Because we conclude that the lost profits and injury to business reputation awards compensate Checker Bag for different injuries, we need not consider this argument.

For these reasons, we find these subparts of issues 1, 3, and 5 to be without merit.

## IV. CONFLICTING JURY FINDINGS

By issue 8, Checker Bag claims that the jury's damages findings contain an irreconcilable conflict which requires a new trial. It points to the differences in the amounts found by the jury in response to different liability theories. On Washington's DTPA claim, the jury found that he had suffered $1,036,000 in lost profits, but found only $500,000 in lost profits on his breach of contract claim. Similarly, the jury found that the injury to Washington's business reputation was $350,000 on his DTPA claim, but only $250,000 on his contract claim.

■■■ The test to determine if a conflict between jury questions is irreconcilable is whether one answer would establish a cause of action while the other answer would destroy it. *Trevino v. Brookhill Capital Resources, Inc.*, 782 S.W.2d 279, 282 (Tex.App.—Houston [1st Dist.] 1989, writ denied). In other words, one finding must be such that it would warrant judgment for one of the parties, and the other

finding would warrant judgment for the other party. *Long Island Owner's Ass'n, Inc. v. Davidson*, 965 S.W.2d 674, 688 (Tex.App.—Corpus Christi 1998, pet. denied); *Lee v. Huntsville Livestock Services, Inc.*, 934 S.W.2d 158, 160 (Tex. App.—Houston [14th Dist.] 1996, no pet.). Additionally, only if the conflict is between material and controlling issues will it be decisive. *DiFrancesco v. Houston General Ins. Co.*, 858 S.W.2d 595, 598 (Tex. App.—Texarkana 1993, no writ). Otherwise, the conflict will be disregarded as immaterial. *Judice v. Mewbourne Oil Co.*, 890 S.W.2d 180, 183 (Tex.App.—Amarillo 1994), *rev'd on other grounds*, 939 S.W.2d 133 (Tex.1996).

■■■ Even if the two separate amounts found as damages do conflict, they are not in fatal conflict. Under either finding, Washington, not Checker Bag, is entitled to judgment. Washington had the right to elect which theory to proceed to judgment under. *See Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex.1998); *Waite Hill Services, Inc. v. World Class Metal Works, Inc.*, 959 S.W.2d 182, 184 (Tex.1998). The damages findings under the contact claim are immaterial to the final judgment rendered by the trial court. *See Spradling*, 566 S.W.2d at 564; *Leonard & Harral Packing Co.*, 883 S.W.2d at 345–46; *George Grubbs Enterprises*, 881 S.W.2d at 866 n. 7. Thus, we will disregard whatever conflict there may be between the two findings. *See Long Island Owner's Ass'n*, 965 S.W.2d at 688; *Judice*, 890 S.W.2d at 183. Issue 8 is without merit.

## V. Attack on Checker Bag's attorney

Finally, Checker Bag contends that the jury's decision was contaminated by an attack on its counsel's integrity by Washington's attorney. The basis of this complaint occurred during the cross-examination of Richard Wall, the last witness to testify at the trial. To fully understand the context, though, Wall's direct examination must be considered as well:

Q [By Checker Bag]: Now, Exhibit 6 is represented to the Court as being a bag of really good cotton candy.... And I submit to you that when this bag of cotton candy was admitted into evidence on Monday, it was stuffed full. Could you examine that and see if you can see any signs of cotton candy deterioration from Monday of this week, if it was submitted to this jury Monday?

A: There are crystal balls of sugar melting down all over the pink and blue, and the blue has lots of signs of— of breakdown.

Q: It's falling apart, isn't it? It's starting to fall apart?

A: It's doing its thing.

. . .

Q: And the bag, if it was full Monday, it's not full now, is it?

A: It looks to be compressing.

[Checker Bag]: No further questions.

. . .

Q [by Washington]: This bag that your attorney and you are saying is so broken down and so decompressed ... Did your attorney also tell you that during the course of the last week, he's done everything from squish it to throw it to beat it to hit it? ... Did he tell you that?

[Checker Bag's attorney]: Your Honor, I strenuously object that I have, in any way, tampered with his evidence. The only damn thing I did was [Washington's attorney] kept hiding it in this box to keep it out of the fluorescent, and I took it out of the box and put it out there. That's what I did. And I apologize to the Court, but I have ... never, ever had an attorney insinuate that I did anything to an exhibit.

THE COURT: Calm down, [Checker Bag's attorney]. Now, have your seat. Have your seat, sir.... What was the insinuation, [Washington's attorney]?

. . .

[Washington's attorney]: I'm just asking him did— the way it was handled— yes. I mean, the insinuation simply was what was handled, how it was handled through the course of the trial.... I'll with— I'll withdraw it, and I apologize to the Court. The jury has seen what the jury has seen, and I'll move on.

THE COURT: Move on, please.

▮ Attacks on opposing counsel's integrity are categorically prohibited. *Amelia's Automotive, Inc. v. Rodriguez,* 921 S.W.2d 767, 773 (Tex.App.—San Antonio 1996, no writ). Such attacks violate the Rules of Professional Conduct. *Id.* (citing TEX. DISCIPLINARY R. PROF. CONDUCT 3.04(c)); *Circle Y of Yoakum v. Blevins,* 826 S.W.2d 753, 758 (Tex.App.—Texarkana 1992, writ denied) (same). Such conduct also violates an express provision of the Texas Lawyer's Creed. The Texas Lawyer's Creed—A Mandate for Professionalism, 783–784 S.W.2d (Texas Cases) XXXV, art. III(10) (Adopted November 7, 1989). Generally, accusations that opposing counsel manufactured evidence, suborned perjury, or was untruthful are generally considered incurable. *Blevins,* 826 S.W.2d at 758.

▮ The same standard should be applied to a question which constitutes an attack on the integrity of opposing counsel as that which is applied to jury argument containing such an attack. *See Amelia's Automotive,* 921 S.W.2d at 773–74 (applying the same standard). Thus, the complaining party must preserve the issue by a proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, unless the harm caused by the statement is incurable. *Standard Fire Ins. Co. v. Reese,* 584 S.W.2d 835, 839–40 (Tex.1979); *NationsBank of Texas, N.A. v. Akin, Gump, Hauer & Feld, L.L.P.,* 979 S.W.2d 385, 398 (Tex.App.—Corpus Christi 1998, pet. denied).

▮ Given that this comment by Washington's attorney was directed specifically

at the conduct of opposing counsel ("Did your attorney also tell you ... *he's* done everything ..." (emphasis added)), the decision on the issue is close. However, we find that Checker Bag's complaint must be rejected. This comment was not such as to suggest that its impact on the jury could not have been cured. The comment was isolated and quickly withdrawn by Washington's attorney. Thus, Checker Bag was required to properly preserve its complaint. *See id.* As part of that effort, Checker Bag should have asked the trial court to instruct the jury to disregard the comment; failing to do so waives any harm that might have been cured by an instruction. *See Dico Tire, Inc. v. Cisneros,* 953 S.W.2d 776, 799 (Tex.App.—Corpus Christi 1997, pet. denied).

Additionally, there appears to be some basis for the claim that the bag of cotton candy admitted into evidence had been handled roughly. When Washington was testifying, he discussed the same bag:

Q [By Washington]: Now, this [bag of cotton candy] has been handled quite a bit in the last week, has it not?

A: It sure has.

Q: And not just handled, but—

A: Slammed in the box, yes, sir.

. . .

Q: Now, how would you describe—comparing the handling of this over the last week, the slamming in the box, the squeezing and all that, is that normal usage or handling of a product from the time it's shipped until when it's put on the shelf?

A: No, not normal. No.

Although the question should not have been phrased to constitute an attack on opposing counsel, it apparently had a factual basis in that the exhibit had been handled roughly throughout the trial (although who had handled it so is not established elsewhere in the record). Thus, the statement was not "wholly without support in the evidence." *Blevins,* 826 S.W.2d at 759.

That the statement was not "wholly without support in the evidence" amplifies the requirement that Checker Bag pursue its complaint before the trial judge at the time of the infraction. As Washington's attorney commented, "the jury [saw] what the jury [saw]," as did the trial judge. If the statement that Checker Bag's attorney was involved in the mishandling was false, the appropriate time to deal with that false statement was at the time it was made, not on appeal when we are unable to determine the accuracy of the claim. We conclude that Checker Bag's failure to pursue the issue at the time it arose constitutes a waiver of its right to complain about it before us. *Standard Fire Ins. Co.,* 584 S.W.2d at 839–40; *Akin, Gump, Hauer & Feld,* 979 S.W.2d at 398; *Dico Tire,* 953 S.W.2d at 799. Thus, we find issue 23 to be without merit.

## VI. CONCLUSION

We have considered the issues Checker Bag presented and found none to be meritorious. Thus, we affirm the judgment.